UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN BURHANS | : | CIVIL ACTION NO.:3:12CV1462 |
| VS. | : | |
| YALE UNIVERSITY | : | OCTOBER 12, 2012 |

## C O M P L A I N T

Plaintiff Susan Burhans, by and through her undersigned counsel, files her suit against Yale University ("Yale"), and in support thereof alleges the following.

### INTRODUCTION

1.  This is a tort action alleging unlawful retaliation in violation of Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq*. ("Title IX").

2.  In August 1999, Yale University hired Susan Burhans for the position of "Security Educator" which job description required Ms. Burhans, inter alia, to develop campus safety programs and strategies to ensure Yale's compliance with Title IX and related laws.

3.  During her employment, Ms. Burhans repeatedly brought to the attention of Yale officials concerns regarding Yale's non-compliance with the

Title IX and related laws.

4.   In an ongoing and continuous manner, Yale responded to Ms. Burhans' concerns with indifference, hostility and retaliation in many forms including job termination, initially in March 2010, despite ten years of service with excellent performance evaluations.  Ms. Burhans was re-hired by Yale thereafter as a contract employee, designated "part-time" in a new position where she had no authority to enforce or oversee compliance with Title IX.  Ms. Burhans was terminated from this position, effective November, 2012.

## THE PARTIES

5.   Plaintiff is a female resident of Connecticut currently residing in Old Saybrook.  She was employed by Yale from August 1999 until the termination of her employment effective November 2012.

6.   Defendant Yale is a private university located in New Haven, Connecticut.  Yale employs over five hundred individuals.

7.   Yale has received and continues to receive federal financial assistance and benefits such that Yale is subject to the requirements of Title IX.

## JURISDICTION

8.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

9.   Defendant is an educational institution receiving federal financial

assistance for its education and athletic programs and is an enterprise engaged in commerce.  Yale is a fully accredited, private university.

## VENUE

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 on the ground that the events giving rise to Plaintiff's claims occurred in this district, and both parties reside in this district.

## FACTS

11.  Mr. Burhans was hired in August, 1999, as a Communications Specialist.  In that capacity, she also served as Security Education Coordinator. Her responsibilities included developing campus safety programs and strategies to ensure Yale's compliance with Title IX and related federal and state laws.

12.  On various occasions during her employment, Ms. Burhans informed Yale officials of complaints and problems regarding Yale's compliance with federal and state laws, including Title IX.

13.  Yale declined to bring its policies and procedures into compliance and retaliated against Ms. Burhans for expressing complaints about the adequacy of Yale's compliance.  Retaliation occurred repeatedly and continuously over a period of many years from 2001 to 2012.

14.  Yale's retaliatory actions included, inter alia: taking away Ms. Burhans' supervisory and decision-making authority; moving her out of positions

that had authority over compliance and enforcement of Title IX and related

lawes; denying her the ability to perform her duties with regard to public safety

and Title IX compliance; denying her fair pay; reducing her wages; rejecting her

applications for promotions and other employment; moving her office; reducing

the size of her office; giving employment opportunities for which Ms. Burhans

was qualified to unqualified others and ultimately terminating her employment,

effective November 2012.

### Yale's Non-Compliance with Title IX

15.  Title IX guarantees equality and prohibits discrimination on the basis

of sex in education.  Title IX also prohibits retaliation against those who seek

redress or enforcement, and/or who complain about sex discrimination and/or

inadequate policies and procedures to address sex discrimination.

16.  Yale has a history of non-compliance with Title IX.  In or about July,

2012, Yale entered into a Compliance Agreement with the U. S. Department of

Education's Office for Civil Rights, the agency responsible for ensuring

compliance with Title IX.  This Compliance Agreement outlines myriad examples

of Yale's pervasive noncompliance with Title IX, and the U. S. Department of

Education has required that Yale University report periodically and directly to the

department attesting that all agreement requirements are being met into 2014.

17.  Many of the problems identified by the Office for Civil Rights are

4

complaints previously brought to the attention of Yale officials by Ms. Burhans, which complaints were ignored and led to retaliatory actions against Ms. Burhans for expressing her complaints.

18.  After Ms. Burhans was hired in 1999, she began to gather information from students and others so that she could determine Yale's needs and propose effective programming to address Title IX issues with regard to public safety.  On June 28, 2001, Ms. Burhans met with Martha Highsmith, Deputy Secretary of the University (now Associate Vice President) to discuss student concerns about sexual harassment on campus.  Ms. Burhans proposed the development of an education and prevention program and suggested making services available to students to support enforcement of and compliance with Title IX.  Highsmith didnot respond and Ms. Burhans was apprised that she could not develop such programs without Highsmith's permission.  Yale's July 2012 Compliance Agreement with OCR noted the inadequacies in Yale's programming.  Yale agreed to reform its policies and practices.

19.  In Spring 2003, recognizing that alcohol usage is a significant risk factor in sexual assault matters and that incidents of alcohol-involved sexual assaults were increasing, Ms. Burhans trained to become an alcohol prevention educator, then met with Highsmith to discuss the development of alcohol prevention education for students.  Highsmith disallowed Ms. Burhans to begin

alcohol prevention education for students.  Yale's July 2012 Compliance

Agreement with OCR noted inadequacies in Yale's programming.  Yale agreed

to reform its policies and practices.

20.  In 2003 and 2004, Ms. Burhans met and communicated thereafter

with Nathan Copper of the Sexual Assault Crisis Services at the Women and

Families Center, an off-campus non-Yale affiliated service provider for sexual

assault victims.  Copper wanted to collaborate and offer services to victimized

students.  Highsmith disallowed collaboration.  Yale's July 2012 Compliance

Agreement with OCR notes this failure as a problem for Yale.  Yale agreed to

reform its policies and practices.

21.  In 2003 and 2004, Ms. Burhans worked with community service

providers and external law enforcement officials in an effort to collaborate

regarding available resources.  Ms. Burhans asked Highsmith to adjust her job

description to include "community relations".  Highsmith disallowed the

collaboration and denied Ms. Burhans' request for expanded job description.

22.  Each year during Ms. Burhans' employment, Highsmith required

Burhans to contribute to the Clery Report with updated public safety education

information.  In 2003, Highsmith asked Ms. Burhans to specifically work on

Yale's Clery Act Report.  Ms. Burhans read police reports and met with various

campus officials to assess the correct number of reportable incidents.  During a

6

meeting at the office of Yale's General Counsel to discuss the final numbers, Ms.

Burhans informed Highsmith that the sexual assault numbers "were wrong" and

that the number significantly undercounted the truth.  Highsmith responded that

Yale "need only report those incidents that are reported to police."  Thereafter,

Ms. Burhans was forbidden by Highsmith to work on Clery Act Reports ever

again and Ms. Burhans was forbidden to participate in orientation programs for

freshman counselors.  Ms. Burhans was also forbidden to receive training on

Clery Act compliance training and other forms of crime prevention training to

support Title IX.  Yale was investigated by the Department of Education for Clery

Act violations beginning in 2004 and was cited for underreporting incidents of

sexual assault and rape in 2011.  Yale's July 2012 Compliance Agreement with

OCR noted problems with Yale's Clery Act compliance.  Yale agreed to reform its

policies and practices.

　　　　23.  In 2003-04, Ms. Burhans proposed modification to Yale's sexual

assault programming to make reporting to law enforcement officials easier.

Highsmith rejected Ms. Burhans's proposal.  Thereafter, Highsmith edited Ms.

Burhans's job description and removed all mention of Title IX and The Clery Act.

Yale's July 2012 Compliance Agreement with OCR noted concerns regarding

Yale's policies concerning the reporting of sexual assault matters to law

enforcement.  Yale agreed to reform its policies and practices.

7

24.  In June 2004, Ms. Burhans attended an "Inter-Ivy Sexual Assault Meeting" at Yale.  Ms. Burhans reported to Highsmith that initiatives were discussed regarding prevention of alcohol-involved sexual assault and suggested new programming.  Highsmith denied Ms. Burhans the opportunity to develop prevention programs regarding alcohol-involved sexual assault.  Yale's July 2012 Compliance Agreement with OCR noted problems with alcohol-involved sexual assault at Yale.  Yale agreed to reform its policies and practices.

25.  In November 2004, during a meeting of the Committee for the Well-Being of Medical Students at Yale, students reported concerns about having no support when they report sexual assault matters to police.  Students noted that internal grievance procedures were inadequate and caused more harm.  Ms. Burhans offered support but Highsmith retaliated by disallowing Ms. Burhans to offer students her assistance in seeking a law enforcement response.  Yale's 2012 Compliance Agreement with OCR notes problems regarding Yale's policies concerned with reporting sexual assault matters to law enforcement.  Yale agreed to reform its policies and practices.

26.  In January 2005, Ms. Burhans attended an Inter-Ivy meeting at Brown University where she obtained ideas for sexual assault prevention including peer-training and training for Executive Committee members.  Ms. Burhans proposed her ideas to Highsmith who responded by rejecting the proposals.  Yale's 2012

Compliance Agreement with OCR noted these issues as problems for Yale. Yale agreed to reform its policies and practices.

27. In March 2005, Ms. Burhans was asked by law enforcement officials to train as a court advocate to help students involved in external judicial proceedings. Highsmith forbade Ms. Burhans to become trained as a court advocate. Yale's 2012 Compliance Agreement with OCR noted the inadequacies of legal advocacy at Yale. Yale agreed to reform its policies and practices.

28. In September 2005, Ms. Burhans proposed the creation of a web-based consolidated information resource for sexual assault victims. Highsmith rejected Ms. Burhans's proposal and disallowed the creation of web-based consolidation of information and resources. Yale's 2012 Compliance Agreement with OCR noted the lack of consolidated services. Yale agreed to reform its policies and practices.

29. In 2006, Ms. Burhans reported to Highsmith that many students were complaining about being revictimized during sexual assault grievance procedures. Ms. Burhans was asked to create an outline of procedures for submission to Dean Cutler. Ms. Burhans prepared an outline and followed up with questions about improving the process, and she made inquiries about progress regarding the procedures throughout 2006. Her concerns regarding

9

grievance procedures were ignored.  Yale's 2012 Compliance Agreement with

OCR notes the inadequacy of Yale's grievance procedures.  Yale agreed to

reform its policies and practices.

30.  After years of frustration and failed attempts to perform her

responsibilities, Ms. Burhans determined that Yale would not allow her to do her

job and that Yale is inhibiting her efforts to bring Yale into compliance with Title

IX and related laws.

31.  In the fall of 2006, Ms. Burhans began looking for alternative job

opportunities at Yale.

32.  In early 2007, Ms. Burhans applied for the position of Director of

Security Officers Operations.  She was interviewed for the position by an all-male

panel, headed by George Aylward, Director of Security Programs.  Aylward told

Ms. Burhans that they had another "strong candidate" but that unlike Ms.

Burhans, the candidate had no university experience.  As of 2007, Burhans had

worked successfully in Yale's Public Safety for eight years and had written a

detailed plan for the department and had extensive university and student

relations experience.  The job was not offered to Ms. Burhans.  The position was

awarded to a white male who had not written a department plan and had no

university or student relations experience.  Aylward asked Burhans to share the

plan she had developed with the man who was hired for the position.  Burhans

complied with this request.

33.  Ms. Burhans was formally offered the position of Assistant Director of Security Officers Operations at a salary of $80,000 per year.  She was told that her job responsibilities would include supervising her replacement in Crime Prevention and taking over emergency planning.  Burhans accepted the position, which included representing Aylward at meetings.

34.  Between May and June 2007, Ms. Burhans was performing the functions of Assistant Director, but had not yet been formally hired into the position.  She was eventually shown to her new office, which was 1/3 the size of the office of a man with an inferior position who was reporting to her; a man who recently had been demoted.  Ms. Burhans's new office was half the size of her prior office.

35.  Within days of being shown her new smaller office, Ms. Burhans was told she might not have the job after all.  On June 12, 2007, just six days before federal investigators were scheduled to arrive to investigate Yale for Clery Act violations, Burhans was told the job she had been offered had "disappeared." She was told she would keep her current responsibilities and facilitate emergency planning but with no reports.

36.  A white male was then hired for a nighttime supervisory job for which he was paid more money for lesser responsibilities than Burhans.

11

37.   Burhans inquired about yet another management job in Security and was told: "It's all nights, you won't want it."  The job was given to a less qualified white male who did not work "all nights" and who received higher pay than Ms. Burhans.

38.   Burhans agreed, as part of her new position, to perform a long list of emergency planning initiatives, and she hosted meetings with department heads to initiate various relevant programming ideas.  Highsmith prepared a job description for Ms. Burhans which description included only a single reference to "emergency planning support."  The new description expressly reduced Burhans's management responsibilities and salary.  Originally offered $80,000, Burhans's salary was reduced to $72,000 and she was informed the numer could go even lower.

39.   Ms. Burhans was introduced at a Vice President's Division meeting on September 21, 2007, in front of 200 colleagues, as the person responsible for heading up emergency planning, although her job description included no such authority.  She was performing emergency planning duties and had been performing them since the beginning of 2007, but without management authority or fair remuneration.

40.   At the end of 2007, Ms. Burhans's job description was posted as an available position at a salary of $30,000 more than the salary Ms. Burhans was

making.  Ms. Burhans formally applied for the title because she already was

performing the tasks.  Kumba Hinds of the Yale Human Resources Office

approved Burhans's qualifications, but Highsmith refused to interview Ms.

Burhans for the position.

41.  In December 2007, Ms. Burhans's job level was reduced from 25 to

23, ensuring she would not qualify for a management or leadership position.

42.  In January 2008, Ms. Burhans was told she could no longer work in

emergency planning, which was part of her original job description and was part

of the responsibilities she had been performing for many years.  When Ms.

Burhans expressed her distress at losing responsibilities, she was called in for a

meeting with Highsmith where she explained her concerns about loging

responsibilities, opportunities, status and money.  Highsmith was hostile and

criticized Ms. Burhans for refusing to accept her failures and lack of qualifications

for certain jobs and promotions at Yale.

43.  In February 2008, Human Resources admitted to Ms. Burhans that

there were gender equity problems existed in the Yale Security Department.  Ms.

Burhans subsequently requested consideration for other jobs in the Security

Department at Yale but was denied interviews by the department, overseen by

Highsmith.

44.  On March 31, 2008, Burhans sought advice from Yale Medical School

ombudsperson Merle Waxman, as the university side of Yale does not have an ombudsperson.  Waxman referred Burhans to the Yale Equal Employment Opportunity Office.  Director Valarie Stanley agreed to meet Burhans on April 1, 2008.  Stanley showed Burhans the large pile of unresolved complaints and advised her to seek other internal job opportunities.  Stanley said she would support Burhans in finding a new position.

45.  Thereafter, another emergency planning job was posted at a salary of $129,000, which added the exact qualifications Burhans did not possess.  Ms. Burhans was not interviewed.

46.  Ms. Burhans sought other employment opportunities and was repeatedly denied consideration over a course of time up to and including September 2012.

47.  In May 2008, Ms. Burhans reported to Vice President Linda Lorimer her concerns about suffering discrimination and a hostile environment in her attempts to secure appropriate employment at Yale.  Lorimer took no action even after a followup call from Ms. Burhans to determine whether steps would be taken to address her concerns.

48.  In September 2008, Ms. Burhans told Janet Adami in Human Resources about her complaints regarding discrimination and hostile environment.  Adami took no action.

14

49.  In October 2008, Ms. Burhans informed Lorimer of her interest in a position with Customer Insights.  Ms. Burhans was the lead candidate and she informed Lorimer of her interest in the job.  Thereafter, the job was withdrawn and reposted with only one change in the description requiring applicants to have experience that Ms. Burhans did not have.

50.  After being rejected for 32 internal jobs at that point and having endured ongoing hostility, Ms. Burhans filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

51.  Days after Yale received Ms. Burhans's CHRO complaint, Ms. Burhans's superior, George Aylward, canceled all regularly scheduled Monday morning executive meetings.  This deprived Burhans of access to information she needed to perform her duties.

52.  In November 2008, Janet Adams rejected Ms. Burhans's qualifications for several new internal job opportunities, although Burhans already had been approved by Human Resources.  Adami even refused to permit Ms. Burhans to forward a colelague's recommendation to support her candidacvy.

53.  In January 2009, Aylward denied knowledge of Ms. Burhans's work on two major projects despite his having discussed both projects many times at multiple prior meetings with Ms. Burhans.

15

54.  In January 2009, six days after signing off on Yale's response to Ms. Burhans's CHRO complaint, Highsmith made false and derogatory remarks about Ms. Burhans in front of a colleague.  While angrily making those remarks, Highsmigh aggressively stepped from behind her desk and shoved her chair firmly against Burhans's chair, knocking her chair to the side with such force that one side of the chair lifted off the carpet causing Burhans to stumble and catch herself from falling.

55.  Repeatedly from 2008 to 2009, Yale officials, including Highsmith, withheld information from Ms. Burhans that she needed to perform her work effectively.

56.  Beginning in 2008 and continuing to the present in 2012, Ms. Burhans has experienced an increasing number of colleagues avoiding her.

57.  In February 2009, Ms. Burhans was denied the opportunity to prsent an innovative transportation program that she had designed to enhance student safety with improved efficiencies.

58.  In March 2009, Aylward screamed at Ms. Burhans for not having information to which Burhans had been denied access by Highsmith and Aylward.  Aylward threatened to embarrass Ms. Burhans for this in an email to colleagues.

59.  In March 2009, Ms. Burhans begged for help from the Yale HR and

EEO offices to no avail.  She informed both that she was being prevented from doing her job.  Lorimer responded with so much verbal hostility that she literally spit on Ms. Burhans.

60.  After additional hostility, Ms. Burhans complained to the HR, EEO and other Yale officials.  Thereafter, on April 8, 2009, Highsmith sent an email informing Ms. Burhans that her department was being restructured and that lay-offs were likely.

61.  Days later, Ms. Burhans was instructed to begin reporting directly to Highsmith.  Ms. Burhans complained about this change in her job responsibilities to HR and EEO, to no avail.

62.  Aylward subsequently canceled all Security staff meetings, which further isolated Ms. Burhans from access to information relevant to her employment responsibilities.

63.  On June 21, 2009, Ms. Burhans filed a complaint in state court alleging discrimination based on sex.  Days later, Highsmith announced at a staff meeting that Ms. Burhans was a "senior staff" member.  This seeming promotion to "senior staff" status was done without Ms. Burhans's knowledge or request.  Ms. Burhans was being paid at least $15,000 less than her peers and had no staff reports.  Her responsibilities did not change.

64.  In July 2009, HR offered Ms. Burhans a development program

coordinator position at a salary $16,000 lower than her rate of pay at that time.

65.  As of August 2009, Ms. Burhans had applied for fifty internal positions.  She was rejected for all but one.  The one she was offered, the development program coordinator position, required her to accept a $16,000 pay cut.

66.  In September 2009, Yale Student Annie Le was murdered and raped on campus.  Highsmith withheld information from Burhans regarding campus community support meetings, thereby affecting Burhans's ability to perform her job.

67.  In October 2009, another job opportunity was presented to Mr. Burhans, although Janet Adami said Burhans was not qualified and refused to put her CV forward.  Once the hiring manager knew Burhans was interested, and reviewed her CV, she told Adami she wanted to interview Burhans.  Burhans was told that she was the leading candidate for the position.  Thereafter, for no apparent reason, the job was cancelled.

68.  During this same time period, a group of security program employees went to the EEO office at Yale and complained about discrimination in hiring practices by Aylward and others; some of the same individuals who had engaged in discriminatory practices against Ms. Burhans were named in this complaint.

69.  Highsmith reorganized security programs, after which Burhans was

18

required to meet with Highsmith alone in her office on December 15, 2009.

During that meeting, Highsmith, who was in charge of campus public safety,

became so hostile that Burhans felt threatened and had to leave the office and

notify HR.

70.   Thereafter, Ms. Burhans became even more isolated and targeted for

additional retaliation.  She feared for her safety and sought support from EAP

MSW Regina Belmont.  Belmont recommended that Ms. Burhans receive care

from Wellness Corporation, Yale's EAP vendor.  Ms. Burhans sought treatment

from Dr. Thomas, who described the environment at Yale as "toxic" for Ms.

Burhans.

71.   Thereafter, Yale offered Ms. Burhans the choice of taking a medical

leave, taking an administrative leave without pay, continuing to work in the same

circumstances, or resignation.

72.   In January 2010, Ms. Burhans wrote a letter to several leaders at

Yale including President Richard Levin, complaining to them about the

discrimination, hostile environment and ongoing retaliation she was experiencing.

Levin did not respond, nothing changed and employment circumstances

worsened for Ms. Burhans.

73.   In February 2010, Highsmith delayed approval of a project that had

been completed in a timely manner by Ms. Burhans.  The delay set the project's

19

timing back, which threatened harm to Ms. Burhans's reputation.

74.  In February 2010, at a Public Safety administrative meeting, Highsmith announced imminent lay-offs and asked for a show of hands from employees with college-aged children.  Highsmith knew Ms. Burhans was the only employee with a child who needed and was taking advantage of the Yale scholarship program for employees.

75.  During February and March of 2010, Highsmith failed to approve or even respond to Ms. Burhans's work, causing delays and preventing approvals for important projects.

76.  During February and March, 2010, Highsmith scheduled and canceled meetings with Ms. Burhans, which caused confusion, particularly when meetings were being scheduled by email during non-business hours over the weekend.  In one email, Highsmith told Ms. Burhans she was sorry that Burhans found the work "so challenging".  Ms. Burhans replied that the work was not challenging, and that Highsmith's disruptive interference with her work was the problem.  Highsmith subsequently threatened to terminate Ms. Burhans for "extreme insubordination" for this comment.

77.  On March 8, 2010, Ms. Burhans became so emotionally distraught that she was constrained to take a few days of medical leave.  Ms. Burhans had been experiencing headaches, nausea, sleeplessness and emotional distress.

20

78.  On March 8, 2010, after work hours, on the same day Burhans was to begin a few days off due to stress, Highsmith sent Burhans a derogatory email, threatening to terminate Ms. Burhans for poor job performance.  Highsmith knew that Ms. Burhans had been performing her duties effectively for many years, yet the email was described by Highsmith as a "formal warning."

79.  Thereafter, Ms. Burhans complained to HR, EEO and other Yale officials, but to no avail.

80.  Dr. Thomas then wrote a second letter expressing concern that Ms. Burhans was experiencing severe distress due to the hostility, ongoing retaliation and "toxic" environment.

81.  On March 23, 2010, Ms. Burhans arrived for a scheduled meeting with Highsmith.  Highsmith stated that Ms. Burhans was "laid off" and that Burhans was forbidden to tell anyone.  Highsmith then walked out.

82.  The next day, Ms. Burhans was told to leave campus "ASAP" because Highsmith wanted her off campus immediately.

83.  As of 2010, Ms. Burhans had worked at Yale for more than ten years, and had received excellent reviews.  She was offered no transitional assistance and her Yale email and Net ID were immediately cancelled denying Burhans access to ten years of colleague contacts, helpful work records, and documents reflecting career accomplishments.

84.  Ms. Burhans emptied out her office in three days.  On April 1, 2010, Ms. Burhans left the Yale campus as instructed while Blance Temple from HR supervised her exit off campus.

85.  Ms. Burhans's colleagues had no idea why she was terminated. Highsmith sent an email announcing Ms. Burhans's termination with no explanation and no forwarding contact information.

86.  Ms. Burhans requested a letter of reference so that she could seek employment elsewhere, but the letter she received was unusable because it did not fairly reflect her work history.

87.  Ms. Burhans lost her medical insurance while ill and had to badger Yale to get it reinstated and lost the capacity to make contributions to retirement accounts due to the lay-off.

88.  In July 2010, Yale's General Counsel allowed a Yale graduate program, that had been renting space from Ms. Burhans for five years, to break the lease and stop paying rent.  Yale offered no remedy for extgensive damage to Ms. Burhans's property caused by the program members.

89.  Ms. Burhans subsequently applied for many jobs at Yale without success.

90.  In December 2010, Ms. Burhans was hired for an internal job at Yale as a project manager.  The job was for contract employment only, for a one-year

period, and required Burhans to work outside of her expertise and away from her previously established peer network.  She was designated "part-time" and the only non-permanent employee in the department, and she was not afforded the same support, access to information, or job security as every other employee.

91.  In April 2011, 16 Yale students filed a complaint with the Department of Education's Office for Civil Rights, alleging multiple violations of students' federal rights under Title IX.  The complaint alleged that Yale had failed to adopt effective and equitable policies and procedures.  Many of the same problems identified in the students' complaints had previously been identified and brought to the attention of Yale officials by Ms. Burhans.  Ms. Burhans's concerns were ignored by Yale and Ms. Burhans suffered retaliation for her complaints and for her efforts to bring Yale into compliance with Title IX.

92.  On May 23, 2011, the U. S. Department of Education, after its longest investigation ever, cited Yale for "Failure to Properly File and Disclose Crime Statistics," specifically referring to sexual assault statistics which was exactly the problem Burhans had tried to correct.

93.  Ms. Burhans was notified in the summer of 2012 that her current job at Yale would end in November 2012.

**RETALIATION IN VIOLATION OF 42 U.S.C. §§ 2000e-1, *et seq.***

94.  The defendant retaliated against the plaintiff in violation of 42 U.S.C. §§ 2000e-1, *et seq.*, for her good faith reporting and complaining about Yale's noncompliance with Title IX.

95.  Repeatedly and during a course of conduct from 2001 to 2012, the plaintiff endured retaliation by the defendant in response to her complaints about the hostile environment to which she was being subjected.

96.  The defendant's retaliatory acts caused the plaintiff to suffer adverse consequences in her employment.

97.  The plaintiff ultimately was terminated from employment at defendant in retaliation for her good faith reporting and complaining about the hostile environment to which she was being subjected, and for the defendant's noncompliance with Title IX.

98.  As a direct and proximate result of the defendant's actions, the plaintiff suffered and continues to suffer lost earnings and benefits, emotional pain, adverse medical diagnoses, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Susan Burhans prays for relief as follows:

1.  Judgment awarding Plaintiff back pay, front pay, damages for adverse

24

medical diagnoses, emotional distress, compensatory damages, and punitive

damages, in an amount to be determined at trial but no less than ten million

dollars ($10,000,000.00);

2.  Attorney fees and costs;

3.  Prejudgment interest at the statutory rate;

4.  Such other and further relief as the Court may deem appropriate.


     ***The plaintiff claims trial by jury.***


THE PLAINTIFF


BY:_____/s/_____
          JOHN R. WILLIAMS (ct00215)
          51 Elm Street
          New Haven, CT 06510
          203.562.9931
          Fax:  203.776.9494
          jrw@johnrwilliams.com
          Her Attorney


Of Counsel:

Wendy J. Murphy, Esq.
1 Exeter Plaza
Boston, MA 02116-2844