UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUSAN BURHANS | : | |
| VS. | : | NO. 3:12cv1462(WWE) |
| YALE UNIVERSITY | : | JUNE 15, 2014 |

**SUR-REPLY BRIEF IN OPPOSITION TO MOTION TO DISMISS COUNT ONE**

     The defendant continues to assert that the "plaintiff's claim that she was retaliated against 'for her good faith reporting and complaining about Yale's noncompliance with Title IX'...fails to identify any specific act of non-compliance that she brought to Yale's attention."  (Defendant's Brief, p. 1) The Complaint includes the following detailed allegations:

     3.  During her employment, Ms. Burhans repeatedly brought to the attention of Yale officials concerns regarding Yale's non-compliance with the Title IX and related laws.

     4.  In an ongoing and continuous manner, Yale responded to Ms. Burhans' concerns with indifference, hostility and retaliation in many forms including job termination, initially in March 2010, despite ten years of service with excellent performance evaluations.  Ms. Burhans was re-hired by Yale thereafter as a contract employee, designated "part-time" in a new position where she had no authority to enforce or oversee compliance with Title IX.  Ms. Burhans was terminated from this position, effective November, 2012.

17. Many of the problems identified by the Office for Civil Rights are complaints previously brought to the attention of Yale officials by Ms. Burhans, which complaints were ignored and led to retaliatory actions against Ms. Burhans for expressing her complaints.

18. After Ms. Burhans was hired in 1999, she began to gather information from students and others so that she could determine Yale's needs and propose effective programming to address Title IX issues with regard to public safety. On June 28, 2001, Ms. Burhans met with Martha Highsmith, Deputy Secretary of the University (now Associate Vice President) to discuss student concerns about sexual harassment on campus. Ms. Burhans proposed the development of an education and prevention program and suggested making services available to students to support enforcement of and compliance with Title IX. Highsmith did not respond and Ms. Burhans was apprised that she could not develop such programs without Highsmith's permission. Yale's July 2012 Compliance Agreement with OCR noted the inadequacies in Yale's programming. Yale agreed to reform its policies and practices.

19. In Spring 2003, recognizing that alcohol usage is a significant risk factor in sexual assault matters and that incidents of alcohol-involved sexual assaults were increasing, Ms. Burhans trained to become an alcohol prevention educator, then met with Highsmith to discuss the development of alcohol prevention education for students. Highsmith disallowed Ms. Burhans to begin alcohol prevention education for students. Yale's July 2012 Compliance Agreement with OCR noted inadequacies in Yale's programming. Yale agreed to reform its policies and practices.

20. In 2003 and 2004, Ms. Burhans met and communicated thereafter with Nathan Copper of the Sexual Assault Crisis Services at the Women and Families Center, an off-campus non-Yale affiliated service provider for sexual assault victims. Copper wanted to collaborate and offer services to victimized students. Highsmith disallowed collaboration. Yale's July 2012 Compliance Agreement with OCR notes this failure as a problem for Yale. Yale agreed to reform its policies and practices.

21. In 2003 and 2004, Ms. Burhans worked with community service providers and external law enforcement officials in an effort to collaborate regarding available resources. Ms. Burhans asked Highsmith to adjust her job description to include "community relations". Highsmith disallowed the collaboration and denied Ms. Burhans' request for expanded job description.

22. Each year during Ms. Burhans' employment, Highsmith required Burhans to contribute to the Clery Report with updated public safety education information. In 2003, Highsmith asked Ms. Burhans to specifically work on Yale's Clery Act Report. Ms. Burhans read police reports and met with various campus officials to assess the correct number of reportable incidents. During a meeting at the office of Yale's General Counsel to discuss the final numbers, Ms. Burhans informed Highsmith that the sexual assault numbers "were wrong" and that the number significantly undercounted the truth. Highsmith responded that Yale "need only report those incidents that are reported to police." Thereafter, Ms. Burhans was forbidden by Highsmith to work on Clery Act Reports ever again and Ms. Burhans was forbidden to participate in orientation programs for freshman counselors. Ms. Burhans was also forbidden to receive training on Clery Act compliance training and other forms of crime prevention training to support Title IX. Yale was investigated by the Department of Education for Clery Act violations beginning in 2004 and was cited for underreporting incidents of sexual assault and rape in 2011. Yale's July 2012 Compliance Agreement with OCR noted problems with Yale's Clery Act compliance. Yale agreed to reform its policies and practices.

23. In 2003-04, Ms. Burhans proposed modification to Yale's sexual assault programming to make reporting to law enforcement officials easier. Highsmith rejected Ms. Burhans's proposal. Thereafter, Highsmith edited Ms. Burhans's job description and removed all mention of Title IX and The Clery Act. Yale's July 2012 Compliance Agreement with OCR noted concerns regarding Yale's policies concerning the reporting of sexual assault matters to law enforcement. Yale agreed to reform its policies and practices.

24. In June 2004, Ms. Burhans attended an "Inter-Ivy Sexual Assault Meeting" at Yale. Ms. Burhans reported to Highsmith that initiatives were discussed regarding prevention of alcohol-involved sexual assault and suggested new programming. Highsmith denied Ms. Burhans the opportunity to develop prevention programs regarding alcohol-involved sexual assault. Yale's July 2012 Compliance Agreement with OCR noted problems with alcohol-involved sexual assault at Yale. Yale agreed to reform its policies and practices.

25. In November 2004, during a meeting of the Committee for the Well-Being of Medical Students at Yale, students reported concerns about having no support when they report sexual assault matters to police. Students noted that internal grievance procedures were inadequate and caused more harm. Ms. Burhans offered support but Highsmith retaliated by disallowing Ms. Burhans to offer students her assistance in seeking a law enforcement response. Yale's 2012 Compliance Agreement with OCR notes problems regarding Yale's policies concerned with reporting sexual assault matters to law enforcement. Yale agreed to reform its policies and practices.

26. In January 2005, Ms. Burhans attended an Inter-Ivy meeting at Brown University where she obtained ideas for sexual assault prevention including peer-training and training for Executive Committee members. Ms. Burhans proposed her ideas to Highsmith who responded by rejecting the proposals. Yale's 2012 Compliance Agreement with OCR noted these issues as problems for Yale. Yale agreed to reform its policies and practices.

27. In March 2005, Ms. Burhans was asked by law enforcement officials to train as a court advocate to help students involved in external judicial proceedings. Highsmith forbade Ms. Burhans to become trained as a court advocate. Yale's 2012 Compliance Agreement with OCR noted the inadequacies of legal advocacy at Yale. Yale agreed to reform its policies and practices.

28. In September 2005, Ms. Burhans proposed the creation of a web-based consolidated information resource for sexual

assault victims.  Highsmith rejected Ms. Burhans's proposal and disallowed the creation of web-based consolidation of information and resources.  Yale's 2012 Compliance Agreement with OCR noted the lack of consolidated services.  Yale agreed to reform its policies and practices.

29.  In 2006, Ms. Burhans reported to Highsmith that many students were complaining about being revictimized during sexual assault grievance procedures.  Ms. Burhans was asked to create an outline of procedures for submission to Dean Cutler.  Ms. Burhans prepared an outline and followed up with questions about improving the process, and she made inquiries about progress regarding the procedures throughout 2006.  Her concerns regarding grievance procedures were ignored.  Yale's 2012 Compliance Agreement with OCR notes the inadequacy of Yale's grievance procedures.  Yale agreed to reform its policies and practices.

47.  In May 2008, Ms. Burhans reported to Vice President Linda Lorimer her concerns about suffering discrimination and a hostile environment in her attempts to secure appropriate employment at Yale.  Lorimer took no action even after a followup call from Ms. Burhans to determine whether steps would be taken to address her concerns.

48.  In September 2008, Ms. Burhans told Janet Adami in Human Resources about her complaints regarding discrimination and hostile environment.  Adami took no action.

50.  After being rejected for 32 internal jobs at that point and having endured ongoing hostility, Ms. Burhans filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

59.  In March 2009, Ms. Burhans begged for help from the Yale HR and EEO offices to no avail.  She informed both that she was being prevented from doing her job.  Lorimer responded with so much verbal hostility that she literally spit on Ms. Burhans.

60. After additional hostility, Ms. Burhans complained to the HR, EEO and other Yale officials. Thereafter, on April 8, 2009, Highsmith sent an email informing Ms. Burhans that her department was being restructured and that lay-offs were likely.

63. On June 21, 2009, Ms. Burhans filed a complaint in state court alleging discrimination based on sex. Days later, Highsmith announced at a staff meeting that Ms. Burhans was a "senior staff" member. This seeming promotion to "senior staff" status was done without Ms. Burhans's knowledge or request. Ms. Burhans was being paid at least $15,000 less than her peers and had no staff reports. Her responsibilities did not change.

72. In January 2010, Ms. Burhans wrote a letter to several leaders at Yale including President Richard Levin, complaining to them about the discrimination, hostile environment and ongoing retaliation she was experiencing. Levin did not respond, nothing changed and employment circumstances worsened for Ms. Burhans.

76. During February and March, 2010, Highsmith scheduled and canceled meetings with Ms. Burhans, which caused confusion, particularly when meetings were being scheduled by email during non-business hours over the weekend. In one email, Highsmith told Ms. Burhans she was sorry that Burhans found the work "so challenging". Ms. Burhans replied that the work was not challenging, and that Highsmith's disruptive interference with her work was the problem. Highsmith subsequently threatened to terminate Ms. Burhans for "extreme insubordination" for this comment.

79. Thereafter, Ms. Burhans complained to HR, EEO and other Yale officials, but to no avail.

80. Dr. Thomas then wrote a second letter expressing concern that Ms. Burhans was experiencing severe distress due to the hostility, ongoing retaliation and "toxic" environment.

***To make it easier***, Count One includes these specific allegations:

18.  After Ms. Burhans was hired in 1999, she began to gather information from students and others so that she could determine Yale's needs and propose effective programming to address Title IX issues with regard to public safety.  On June 28, 2001, Ms. Burhans met with Martha Highsmith, Deputy Secretary of the University (now Associate Vice President) to discuss student concerns about sexual harassment on campus.  Ms. Burhans proposed the development of an education and prevention program and suggested making services available to students to support enforcement of and compliance with Title IX.

19.  In Spring 2003, recognizing that alcohol usage is a significant risk factor in sexual assault matters and that incidents of alcohol-involved sexual assaults were increasing, Ms. Burhans trained to become an alcohol prevention educator, then met with Highsmith to discuss the development of alcohol prevention education for students.

20.  In 2003 and 2004, Ms. Burhans met and communicated thereafter with Nathan Copper of the Sexual Assault Crisis Services at the Women and Families Center, an off-campus non-Yale affiliated service provider for sexual assault victims.  Copper wanted to collaborate and offer services to victimized students.

21.  In 2003 and 2004, Ms. Burhans worked with community service providers and external law enforcement officials in an effort to collaborate regarding available resources.  Ms. Burhans asked Highsmith to adjust her job description to include "community relations".

22. ... In 2003,...Ms. Burhans informed Highsmith that the sexual assault numbers "were wrong" and that the number significantly undercounted the truth.

23.  In 2003-04, Ms. Burhans proposed modification to Yale's sexual assault programming to make reporting to law enforcement officials easier.

24. In June 2004, Ms. Burhans attended an "Inter-Ivy Sexual Assault Meeting" at Yale. Ms. Burhans reported to Highsmith that initiatives were discussed regarding prevention of alcohol-involved sexual assault and suggested new programming.

25. In November 2004,...students reported concerns about having no support when they report sexual assault matters to police....Ms. Burhans offered support but Highsmith retaliated by disallowing Ms. Burhans to offer students her assistance in seeking a law enforcement response.

26. In January 2005, Ms. Burhans...proposed her ideas to Highsmith who responded by rejecting the proposals.

27. In March 2005, Ms. Burhans was asked by law enforcement officials to train as a court advocate to help students involved in external judicial proceedings. Highsmith forbade Ms. Burhans to become trained as a court advocate.

28. In September 2005, Ms. Burhans proposed the creation of a web-based consolidated information resource for sexual assault victims.

29. In 2006, Ms. Burhans reported to Highsmith that many students were complaining about being revictimized during sexual assault grievance procedures....Ms. Burhans prepared an outline and followed up with questions about improving the process, and she made inquiries about progress regarding the procedures throughout 2006.

42. In January 2008, Ms. Burhans...expressed her distress at losing responsibilities....

47. In May 2008, Ms. Burhans reported to Vice President Linda Lorimer her concerns about suffering discrimination and a hostile environment....

48. In September 2008, Ms. Burhans told Janet Adami in Human Resources about her complaints regarding discrimination

50. ...Ms. Burhans filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

51. ...Yale received Ms. Burhans's CHRO complaint....

54. In January 2009, six days after signing off on Yale's response to Ms. Burhans's CHRO complaint, Highsmith made false and derogatory remarks about Ms. Burhans in front of a colleague.

59. In March 2009, Ms. Burhans begged for help from the Yale HR and EEO offices to no avail. She informed both that she was being prevented from doing her job.

60. After additional hostility, Ms. Burhans complained to the HR, EEO and other Yale officials.

61. ...Ms. Burhans complained about this change in her job responsibilities to HR and EEO, to no avail.

63. On June 21, 2009, Ms. Burhans filed a complaint in state court alleging discrimination based on sex.

72. In January 2010, Ms. Burhans wrote a letter to several leaders at Yale including President Richard Levin, complaining to them about the discrimination, hostile environment and ongoing retaliation she was experiencing.

76. During February and March, 2010,...Ms. Burhans replied...that Highsmith's disruptive interference with her work was the problem.

79. Thereafter, Ms. Burhans complained to HR, EEO and other Yale officials, but to no avail.

80. Dr. Thomas then wrote a second letter expressing concern that Ms. Burhans was experiencing severe distress due to

the hostility, ongoing retaliation and "toxic" environment.

These are not "boiler-plate" allegations as the defendant claims. They are specific and detailed allegations of repeated instances in which the plaintiff complained to the defendant at the very highest levels about (1) specific changes that needed to be made to bring the defendant into compliance with Title IX, (2) specific violations by the defendant of the requirements of Title IX, and (3) sex discrimination and hostile-environment against the plaintiff herself based on the plaintiff's sex and her opposition to unlawful practices of the defendant as to both herself and others with regard to their sex.

Virtually every one of the plaintiff's many complaints resulted in an adverse response and ultimately the plaintiff was terminated. The plaintiff has alleged in great detail a direct connection between her protected actions and the adverse employment actions visited upon her.

"In the Title IX context, 'speak[ing] out against sex discrimination'...is protected activity." Emeldi v. University of Oregon, 673 F.3d 1218, 1225 (9th Cir. 2012), *quoting* Jackson v. Birmingham Board of Education, 544 U.S. 167, 178 (2005). *Cf.* Papelino v. Albany College of Pharmacy of Union University, 633 F.3d 81, 91 (2nd Cir. 2011).

The standard for assessing whether a plaintiff has been the victim of unlawful retaliation for her opposition to sex discrimination under Title IX is the

same as that applied to retaliation claims under Title VII.  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 616 n. 1 (1999); Emeldi, *supra*, at 1224.  Count One more than meets that test.  The plaintiff specifically alleges numerous instances in which she opposed unlawful sex discrimination against others and against herself, and numerous instances in which she proposed programs and policies to reduce that discrimination in accordance with the requirements of Title IX; the plaintiff recites repeated contemporaneous adverse actions against her whenever she made such complaints, concluding with the ultimate adverse employment action of termination; and the plaintiff alleges circumstances clearly sufficient to demonstrate that all of these adverse employment actions, specifically including but not limited to her termination, were directly in response to her complaints.

      The motion to dismiss must be denied.

                               Respectfully submitted

                               /s/
                        JOHN R. WILLIAMS (ct00215)
                        51 Elm Street
                        New Haven, CT 06510
                        203.562.9931
                        Fax:  203.776.9494
                        jrw@johnrwilliams.com
                        Plaintiff's Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                                                /s/
                                     JOHN R. WILLIAMS