EXHIBIT B

SUPERIOR COURT
JUDICIAL DISTRICT OF NEW HAVEN
AT NEW HAVEN


- - - - - - - - - - - - - - - - -X
SUSAN DARIA BURHANS,                :
                Plaintiff           :
                                    :
VS                                  : CV09-5029548S
                                    :
YALE UNIVERSITY,                    :
                Defendant           :
- - - - - - - - - - - - - - - - -X




Deposition of SUSAN DARIA BURHANS taken at
the offices of John R. Williams & Associates,
51 Elm Street, Suite 409, New Haven,
Connecticut, before Audra Quinn, RPR,
Licensed Shorthand Reporter #106, and Notary
Public, in and for the State of Connecticut
on January 10, 2014, at 9:20 a.m.




DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE, MADISON, CT 06443
(203)245-9583        (800)839-6867
FAX (203)245-2760


HARTFORD        NEW HAVEN        STAMFORD

1   going over the crime stats, and I was concerned because

2   the --

3          Q     Before you get to the concern, I just want to

4   find out what you did.  Is there anything else that you

5   did besides looking at the reports, driving around the

6   campus, and then working with Caroline Hendel and

7   Martha Highsmith to compile statistics?

8          A     I mean I don't know what else you want me to

9   say.  I mean that's what we did.

10         Q     I wasn't there.  I don't compile the Clery

11  Act report.

12         A     Well, I told you what we did, and you're

13  asking for more.  That is what we did.

14         Q     Just so you understand, I'm a lawyer.  I

15  don't do what you do.  I don't know your world.  When I

16  come in and ask you questions, I will almost always ask

17  you did you do anything else until you say no.

18         A     Well, we had a discussion about it in the

19  general counsel's office, and we were all at the table

20  together and at that time I was looking at the

21  statistics, and the sexual assault statistics were not

22  right and the robbery statistics were not right.  And I

23  said to Martha Highsmith, you know, this doesn't look

24  right to me; the sexual assaults statistics are too

25  low, and the robbery doesn't look right.  And Martha
                    DEL VECCHIO REPORTING
                      (203) 245-9583

1   literally glared at me across the table and said, We

2   only have to report those that go to police on sexual

3   assault.  And I said, Oh.

4          Meanwhile I had had Clery training the year

5   before and knew that you're supposed to report every

6   sexual assault, and so this actually coincided with the

7   fact that I was being considered in a job audit, and

8   what Martha did was she told Chief Perrotti and she

9   told other colleagues that I would not be working on

10  the Clery report again.  So it appeared that I was

11  somehow not up to snuff on collecting statistics.  It

12  appeared that I was incompetent, and I had no idea -- I

13  was so naive, I had no idea that I had annoyed Martha

14  Highsmith, but they had been underreporting sexual

15  assaults for years.  And it's interesting because I

16  didn't know that Yale was being investigated right

17  after that for underreporting sexual assaults, and in

18  one of the jobs I was promised, six days before the

19  feds came to campus, I was all the sudden --- I was told

20  my job disappeared.  It was unbelievable.  It was

21  unbelievable.

22      Q     And --

23      A     And these were people coming to campus to

24  investigate underreporting of sexual assault, which of

25  course Yale was fined for.

1      Q      And did you register any complaints to anyone

2   about the investigation with regard to Alexandra

3   Gerena?

4      A      We talked about it amongst ourselves, and

5   what I did, Patrick, was around that time, instead of

6   complaining, what I did was I tried to initiate

7   programming to answer the concerns of the students.   So

8   during that time, right around the time of Alexandra

9   Gerena was when I put forward to Martha Highsmith six

10  specific programs and ways to change procedures for

11  victims.   So that's what I did.

12     Q      And when you proposed those new procedures to

13  Martha Highsmith, did you relate that, those procedures

14  to the Gerena case when you talked to Ms. Highsmith

15  about it?

16     A      I talked in general because of

17  confidentiality.   I said students were unhappy with

18  sexual assault response, and I said we needed trained

19  people in the residential colleges, trained in referral

20  other than just to Carol Goldberg to pat the victim's

21  hand.

22            I also mentioned that up until -- in 2002 was

23  the last year that I addressed the freshman counselors.

24  Freshman counselors are usually the first line of --

25  the first point of access for a student who is having

DEL VECCHIO REPORTING
(203) 245-9583

1   Did you communicate with her other than in writing?

2        A    Oh, yeah.  We met.  She walked me downstairs

3   like I was a perpetrator.  It was bizarre.

4        Q    I'm going to ask more questions about her

5   later, but right now I'm just trying to whittle out who

6   I need to ask more questions about.

7             How about -- I'm going to guess that you had

8   meetings and/or phone conversations with the following:

9   Linda Lorimer, Martha Highsmith, Chris Pedevillano,

10  Janet Adami, Merle Waxman, Christine Perez, Valarie

11  Stanley, Sandra Greer, Corey Rossman, and Blanche

12  Temple.  Am I right?

13       A    Yes.

14       Q    That just saves me asking about each of them

15  individually.

16       A    Sure.

17       Q    So then let's go back to Donna Cable then.

18            Well, before I ask about Donna Cable, let me

19  ask you this.  Putting aside the complaints you

20  registered about your treatment, treatment of you, did

21  you complain to anyone at Yale about what you saw as

22  Title IX or Clery Act violations beyond what you've

23  already told us which was to suggest new procedures?

24       A    I mean, yes.  I can't remember every

25  conversation, you know, and when I spoke with my

                 DEL VECCHIO REPORTING
                    (203) 245-9583

1    bosses, I tried to advocate for things that would help

2    change the environment.  I didn't want to go after

3    them, well, this happened and that's your fault.  I

4    mean that's not productive.

5        Q    But the question is -- I know that you have

6    said that several times you made certain proposals for

7    changes to the procedures.

8        A    And I also complained about -- I complained,

9    I reiterated what the students told me, that they

10   weren't being treated fairly, that sexual assault

11   response wasn't appropriate, that they didn't feel

12   supported, that many people didn't report because

13   reporting was worse than not reporting.  I did say all

14   those things.

15       Q    And is any of that in writing?

16       A    It may be somewhere.  I don't know.  I could

17   try to find it, but of course since Martha Highsmith

18   had me marched off campus, I don't have every bit of

19   documentation.

20       Q    How long were you on campus after you

21   received the notice of layoff?

22       A    Like three days.

23       Q    And what did you do during those three days?

24       A    I picked up -- actually, what happened was I

25   believe either March 23 was a Wednesday or Thursday,

1    and I believe I had the next two days off.  I had to go

2    do something.  So I was actually off campus Thursday

3    and Friday.  I came back Monday, Tuesday.  Wednesday I

4    was gone.  Okay.  So those days I cleaned out my

5    office.  I got rid of paperwork I didn't need.  I tried

6    to keep some of my files.  I was trying to keep a very

7    low profile because Martha had threatened me and said

8    that if I -- you know, don't you dare tell anyone

9    you're laid off.  In fact, when I just went to go tell

10   Chief Perrotti only because I didn't want him

11   embarrassed in referring people to me because I

12   wouldn't be there, I got yelled at for doing that.

13        Q    And during the three days or so that you

14   spent on campus after you were informed of the layoff,

15   did you copy any materials to keep?

16        A    Some, yes.

17        Q    And what in particular did you copy?

18        A    You know, I don't remember, but I

19   certainly --

20        Q    Did you copy some of your emails?

21        A    Yes, I did, but I don't remember.  You know,

22   I know I certainly wasn't able to copy everything.

23        Q    And did you copy materials that you thought

24   were going to be relevant to your lawsuit?

25        A    I may have, but I may have already had some

                     DEL VECCHIO REPORTING
                       (203) 245-9583

1    of those things, you know.

2         Q    Now, with regard to the people to whom you

3    said the students complained that the procedures were

4    unfair and they had concerns about the way in which

5    they should report either Title IX or -- I guess Title

6    IX violations, I think you said you don't know one way

7    or the other whether there's anything in writing on

8    that?  Is that right?

9         A    Yeah, I don't know.  I'm not sure.

10        Q    Who do you remember specifically talking with

11   about that subject?  And when I say who, what I mean is

12   in the administration, not coworkers or friends, but

13   someone that you went and complained to and said, hey,

14   we got a problem here, we need to comply with Title IX

15   because the students are complaining that the

16   procedures are not adequate.

17        A    I mean I did it through Martha Highsmith and

18   Betty Trachtenberg and Jill Cutler.  I mean I wasn't --

19   my job was kind of confidential.  It's not like I

20   wanted to go around and bad mouth Yale.

21        Q    Trust me, I'm not criticizing whatever you

22   did.  I'm just trying to find out what it is.

23        A    I'm just telling you what my thinking was.  I

24   talked with Martha, Betty Trachtenberg.  I did talk

25   with Marie Baker at times.  I talked with, you know,

1    different people, but not a lot because I didn't want

2    to take away from what I was trying to do which was to

3    bring a positive face to public safety.

4        Q    All right.  Let me start with Marie Baker.

5    First of all, who was she?  What was her role?

6        A    She was a substance abuse counselor.  I tried

7    to develop with her a -- I tried to develop a program

8    where students would have a really innovative way of

9    understanding alcohol abuse, and she was like no, no,

10   no, you don't understand how they do things here,

11   Lorraine will never allow it, meaning Lorraine Siggins.

12       Q    And was Marie Baker someone who was in the

13   administration?

14       A    She was a substance abuse counselor.

15       Q    Was she someone who when you spoke with her

16   that you thought she had some control over Title IX

17   procedures?

18       A    Well, Marie Baker dealt with students who had

19   alcohol problems, and since sexual assault, date rape

20   and all of that involved alcohol, it was, you know --

21   and in fact, one of the programs that I suggested

22   having to do with alcohol abuse prevention and sexual

23   assault prevention that I wanted to put into place, of

24   course, Yale put into place right after the DOE started

25   investigating.

                     DEL VECCHIO REPORTING
                        (203) 245-9583

1      Q     With regard to Marie Baker, did you tell her

2    that you thought Yale was not in compliance with either

3    the Clery Act or Title IX?

4      A     I didn't put it that way.  I wasn't trying to

5    do that.  I said, Marie, I think this is the

6    programming that's needed, you know, and she kind of

7    agreed, but she said Lorraine would never agree.

8           Can we get back to Donna Cable?

9      Q     We can, but honestly, you know, I've seen

10   people wanting to control depositions, but this is kind

11   of -- I've accommodated you when I can, but I'll lose

12   my thought if I don't ask in the right order.

13          MR. WILLIAMS:  Anyway, we're not going

14          to be done today.

15          MR. NOONAN:  No, we're not, but I'd like

16          to get done as much as I can and do it in

17          kind of a systematic way.

18   BY MR. NOONAN:

19     Q     So with regard to Marie Baker, how many times

20   did you suggest different alcohol procedures to her?

21     A     Probably had about ten meetings.

22     Q     And did she agree to implement any of the

23   changes that you suggested?

24     A     No.  Well, see, she knew she'd have to bring

25   it to Lorraine and Lorraine wouldn't pass it.  It was

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    really alcohol education.  It wasn't like putting more

2    punishment on the kids or anything.  It was redirecting

3    their knowledge of it and giving them a context for

4    that redirection.

5              I also met with off campus providers.

6        Q    All right.  Right now just let me --

7        A    Sure.  I'm sorry.  I thought I was just

8    adding.

9        Q    Let me stick with Yale employees for the

10   moment.

11             So another person that you indicated you

12   spoke with about your concerns about either Title IX or

13   Clery Act violations was Betty Trachtenberg.  Is that

14   right?

15       A    Yes.

16       Q    And do you have anything in writing relating

17   to your communications with her?

18       A    I will look for it, but we sat down.  I sat

19   down with Betty because I was really concerned about

20   the fact that there was no alcohol prevention education

21   on campus at all, and she gave me --

22       Q    At the time what was her role?

23       A    She was associate dean of Yale College.

24       Q    And how many times did you discuss --

25       A    Several times.  I don't know the exact

1    number.

2        Q    And the subject of your discussions with

3    Betty Trachtenberg was alcohol prevention programs?

4        A    Yes.

5        Q    And with regard to either Title IX or Clery

6    Act, did you discuss anything else with her besides the

7    alcohol education programs?

8        A    Yeah.  I just said, you know, alcohol

9    prevention involved preventing sexual assault.

10       Q    And did you talk with her about your feeling

11   that Yale was violating any federal statute or

12   regulation?

13       A    I didn't say it that way.  I said that we

14   were not doing best practices, we were not helping

15   students enough in this area; whatever is being done,

16   it's not enough and it's not the right thing.

17       Q    And do you remember anything else you said to

18   her with regard to the reason why you were proposing

19   new programs on alcohol education?

20       A    I didn't have to tell her.  She knew.

21       Q    That wasn't the question.  I was just asking

22   do you remember anything else you said?

23       A    No.  That was the general conversation.

24       Q    And did you make specific proposals to Betty

25   Trachtenberg of changes that you thought would be

                    DEL VECCHIO REPORTING
                      (203) 245-9583

1   useful?

2        A     I don't know if I wrote up proposals, but I

3   talked with her about them.   I talked with her about

4   them, the same kinds of programs I talked with Marie

5   Baker, and I also spoke with Colleen Lim in athletics.

6        Q     And you spoke with Colleen Lim about alcohol

7   education?

8        A     Yes.

9        Q     Do you recall how many times?

10       A     Twice.

11       Q     And did you suggest to her that you thought

12  Yale was violating any federal statute or regulation?

13       A     No.   I didn't walk around campus saying we're

14  violating this, so let's do this.

15       Q     Just so you know, I know I keep asking the

16  same question with regard --

17       A     But it's --

18       Q     Let me just get my statement out.

19             The only reason I have to ask in order to be

20  complete.   I'm not accusing you.   I expect that you're

21  going to tell me the same thing every time.   If you

22  want to just say no, I didn't, that's okay.   You don't

23  have to tell me why.   I do understand why you didn't,

24  but I'm supposed to be complete, so I have to ask with

25  each person did you.   If you say no, that's good

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    enough.  If you want to give more, you can do that,

2    too.  But I don't want you to think that I don't

3    understand the reason you've already given.

4                 Is there anyone else in the Yale

5    administration that you went to talk with about alcohol

6    education?

7         A    Chief Perrotti.

8         Q    And did you give him any specific proposals

9    regarding --

10        A    It wasn't appropriate for me to give Chief

11   Perrotti specific proposals.  I gave that to my boss,

12   but I spoke with him many times, many times.

13        Q    And did you tell him that you thought Yale

14   was violating any federal statutes or regulations?

15        A    No.

16        Q    And did you talk with Chief Perrotti about

17   any other concerns that you had about Title IX and/or

18   the Clery Act?

19        A    Yes.

20        Q    And did you tell him that you thought Yale

21   was violating either of those acts or the regulations

22   promulgated under them at any time?

23        A    In fact, Chief Perrotti wanted me to apply

24   for a job within his department and the job was -- it's

25   the job Kitty Parente has now and it was called -- it

1    was sort of like an analyzing job, and I didn't tell

2    him this because I didn't want to, but I would never

3    take that job because it would be lying.  You'd have to

4    lie for Yale, and the people doing that are lying for

5    Yale and they don't care.

6        Q    And who is the person that has that job now?

7        A    Kitty Parente and also Steve Woznyk.  They're

8    the people who were doing Clery after I did it, and

9    Steve Woznyk, it's the reason he was promoted to

10   assistant chief.

11       Q    And you think they're lying for Yale?

12       A    I know they're lying for Yale.  I don't think

13   that.

14       Q    What is it that they're lying about?

15       A    Well, what they do is they try to avoid

16   taking complaints, and this way they don't have to

17   register the complaint.

18       Q    And how do you know that that's occurring

19   now?

20       A    Because I've been told.

21       Q    Who told you that?

22       A    People in the police department, but I am not

23   telling you because of the retaliation involved.

24       Q    And have you -- just answer this yes or no.

25   Have you disclosed their identity to anyone else, the

1   people who have reported these two people are lying for

2   Yale, have you reported that to anyone else and given

3   the names of the people who told you that?

4       A    Not specifically.

5       Q    Now, with regard to Chief Perrotti, did you

6   ever tell him that you thought Yale was violating any

7   federal statute or regulation?

8       A    I didn't need to tell Chief Perrotti that.

9       Q    Honestly that isn't -- unfortunately, I'm

10  just going to have to ask you that question again.

11      A    No, I did not.  Chief Perrotti and I, though,

12  did have conversations about the misrepresentation of

13  statistics and procedures.

14      Q    And what did Chief Perrotti say about that?

15      A    Chief Perrotti was -- he had the big picture

16  in mind, like I did, where you don't hate Yale.  Part

17  of the reason I filed this suit is because I do like

18  Yale, I do, and I respect the education that it

19  provides for students.  What I don't respect is what

20  the leadership has been doing in the last 30 years, and

21  I think Chief Perrotti -- I'm not going to speak for

22  him, but some of our conversations made me believe he

23  felt the same way, that things were being

24  misrepresented and that what was being done at Yale was

25  not -- it wasn't living up to what it was selling

1    itself as.

2         Q    So let me ask you specifically.  What do you

3    remember what Chief Perrotti said about your claim that

4    there had been misrepresentations of data by Yale?

5         A    He didn't say too much, but I didn't expect

6    him to.

7         Q    What do you remember him saying?

8         A    You know, I don't want him retaliated against

9    either.

10        Q    Well, I can tell you that Chief Perrotti is

11   not and doesn't intend to be ever again a Yale

12   employee.  So tell me what Chief Perrotti said with

13   regard to your claim that there were misrepresentations

14   in Yale's reporting.

15        A    Well, Chief Perrotti and I, we would always

16   have a laugh after Martha would address the freshman

17   parents because Martha would just lie about New Haven

18   and Yale.  I remember specifically one time we were

19   walking out and he looked at me and I looked at him,

20   and he said, I don't know how she keeps a straight

21   face.  I said, Yeah, I know.

22             But it was our intention to have the parents

23   feel comfortable and to know that we were going to be

24   doing our best by their students.  So we didn't take

25   joy in feeling bad about what Martha was doing, you

183

1    know.

2         Q    And you said before that you had discussions

3    with him about misrepresentations as to data.   What

4    data were you referring to?

5         A    Clery data.

6         Q    So what did Chief Perrotti say about the

7    Clery data?

8         A    Chief Perrotti said very little about the

9    Clery Act.

10        Q    I know you said that before.  I just want to

11   find out what do you recall him saying about the Clery

12   Act data when you talked to him about it?

13        A    We didn't talk about the Clery data.   We

14   talked about people and situations that contributed to

15   not being ethical, and one person Chief Perrotti was

16   very just disappointed in the way they did business was

17   Dorothy Robinson.

18        Q    Let me just get back to the Clery Act.   Did

19   you ever tell Chief Perrotti that you thought that Yale

20   was misrepresenting the data that went into the Clery

21   Act reports?

22        A    No, I never said that to him.   No, I never

23   did.

24        Q    You said you talked ---

25        A    We talked about misrepresentation of crime

DEL VECCHIO REPORTING
(203) 245-9583

1    Perrotti about?

2         A    No.   It's something I've spoken with the

3    victim about.

4         Q    And actually, you've already testified about

5    that before.

6         A    But I want to say -- I didn't say this.   We

7    were talking about masters and deans, and I know of a

8    victim who was running to her dean's house on campus

9    late on a Friday night with bite marks to her face and

10   her breast, and she was going to her dean's house for

11   help with her assailant running after her, and Dean

12   Lassonde tried to keep her from calling the police and

13   brought her to DUH instead of Yale-New Haven Hospital.

14   She had been raped, and he knew darn well that DUH does

15   not have a rape kit and that she would have to go to

16   Yale-New Haven Hospital to have a rape kit done, and

17   the DUH doctor was ticked off at Dean Lassonde for even

18   bringing Alexandra there.   So when Chief Perrotti and

19   other professionals learn of things like that, they are

20   very frustrated.

21        Q    With regard to Martha Highsmith, did you ever

22   tell her that you thought that Yale was in violation of

23   any statute or regulation?

24        A    You've asked me this before, and I've said to

25   you no, I wasn't going to tell my boss that she was

                    DEL VECCHIO REPORTING
                       (203) 245-9583

1    part of avoiding or ignoring federal law.  What I tried

2    to do is support programs and develop initiatives that

3    would bring us into compliance, and that's obviously

4    what Constance Bagley was trying to do and she was

5    retaliated against as well.

6         Q    And was there anyone in the Yale

7    administration to whom you complained that Yale was

8    violating state and federal laws?

9         A    Yes.

10        Q    So who did you tell that Yale was violating

11   state and federal laws in the administration?

12        A    When I am suggesting new programs that will

13   support victims' rights and will support gender equity

14   education and those programs don't exist now, that is

15   the professional way to approach your boss about

16   bringing the institution into federal compliance.

17        Q    I understood that from before.  The question

18   I asked you was did you tell anyone in the Yale

19   administration that you believed that the failure to

20   adopt your proposals was a violation of state or

21   federal law?

22        A    Well, I tried to tell Martha Highsmith and

23   Caroline Hendel with the Clery Act, but they didn't

24   want to hear it.

25        Q    And you've already talked about that

                    DEL VECCHIO REPORTING
                      (203) 245-9583