UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SUSAN BURHANS                                :

VS.                                          :          NO. 3:12cv1462(WWE)

YALE UNIVERSITY                              :          APRIL 7, 2014

## A M E N D E D   C O M P L A I N T

COUNT ONE

      Plaintiff Susan Burhans, by and through her undersigned counsel, files her

suit against Yale University ("Yale"), and in support thereof alleges the following.

### INTRODUCTION

      1.  This is a tort action alleging unlawful retaliation in violation of Title IX of

the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.* ("Title IX").

      2.  In August 1999, Yale University hired Susan Burhans for the position of

"Security Educator" which job description required Ms. Burhans, inter alia, to

develop campus safety programs and strategies to ensure Yale's compliance

with Title IX and related laws.

      3.  During her employment, Ms. Burhans repeatedly brought to the

attention of Yale officials concerns regarding Yale's non-compliance with the Title

IX and related laws.

4.  In an ongoing and continuous manner, Yale responded to Ms. Burhans'
concerns with indifference, hostility and retaliation in many forms including job
termination, initially in March 2010, despite ten years of service with excellent
performance evaluations.  Ms. Burhans was re-hired by Yale thereafter as a
contract employee, designated "part-time" in a new position where she had no
authority to enforce or oversee compliance with Title IX.  Ms. Burhans was
terminated from this position, effective November, 2012.

## THE PARTIES

5.  Plaintiff is a female resident of Connecticut currently residing in Old
Saybrook.  She was employed by Yale from August 1999 until the termination of
her employment effective November 2012.

6.  Defendant Yale is a private university located in New Haven,
Connecticut.  Yale employs over five hundred individuals.

7.  Yale has received and continues to receive federal financial assistance
and benefits such that Yale is subject to the requirements of Title IX.

## JURISDICTION

8.  This Court has subject matter jurisdiction over this action pursuant to
28 U.S.C. §§ 1331 and 1343.

9.  Defendant is an educational institution receiving federal financial

assistance for its education and athletic programs and is an enterprise engaged in commerce.  Yale is a fully accredited, private university.

**VENUE**

10.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 on the ground that the events giving rise to Plaintiff's claims occurred in this district, and both parties reside in this district.

**FACTS**

11.  Mr. Burhans was hired in August, 1999, as a Communications Specialist.  In that capacity, she also served as Security Education Coordinator. Her responsibilities included developing campus safety programs and strategies to ensure Yale's compliance with Title IX and related federal and state laws.

12.  On various occasions during her employment, Ms. Burhans informed Yale officials of complaints and problems regarding Yale's compliance with federal and state laws, including Title IX.

13.  Yale declined to bring its policies and procedures into compliance and retaliated against Ms. Burhans for expressing complaints about the adequacy of Yale's compliance.  Retaliation occurred repeatedly and continuously over a period of many years from 2001 to 2012.

14.  Yale's retaliatory actions included, inter alia: taking away Ms. Burhans' supervisory and decision-making authority; moving her out of positions

3

that had authority over compliance and enforcement of Title IX and related lawes;

denying her the ability to perform her duties with regard to public safety and Title

IX compliance; denying her fair pay; reducing her wages; rejecting her

applications for promotions and other employment; moving her office; reducing

the size of her office; giving employment opportunities for which Ms. Burhans

was qualified to unqualified others and ultimately terminating her employment,

effective November 2012.

## Yale's Non-Compliance with Title IX

15.  Title IX guarantees equality and prohibits discrimination on the basis

of sex in education.  Title IX also prohibits retaliation against those who seek

redress or enforcement, and/or who complain about sex discrimination and/or

inadequate policies and procedures to address sex discrimination.

16.  Yale has a history of non-compliance with Title IX.  In or about July,

2012, Yale entered into a Compliance Agreement with the U. S. Department of

Education's Office for Civil Rights, the agency responsible for ensuring

compliance with Title IX.  This Compliance Agreement outlines myriad examples

of Yale's pervasive noncompliance with Title IX, and the U. S. Department of

Education has required that Yale University report periodically and directly to the

department attesting that all agreement requirements are being met into 2014.

17.  Many of the problems identified by the Office for Civil Rights are

4

complaints previously brought to the attention of Yale officials by Ms. Burhans, which complaints were ignored and led to retaliatory actions against Ms. Burhans for expressing her complaints.

18.  After Ms. Burhans was hired in 1999, she began to gather information from students and others so that she could determine Yale's needs and propose effective programming to address Title IX issues with regard to public safety.  On June 28, 2001, Ms. Burhans met with Martha Highsmith, Deputy Secretary of the University (now Associate Vice President) to discuss student concerns about sexual harassment on campus.  Ms. Burhans proposed the development of an education and prevention program and suggested making services available to students to support enforcement of and compliance with Title IX.  Highsmith didnot respond and Ms. Burhans was apprised that she could not develop such programs without Highsmith's permission.  Yale's July 2012 Compliance Agreement with OCR noted the inadequacies in Yale's programming.  Yale agreed to reform its policies and practices.

19.  In Spring 2003, recognizing that alcohol usage is a significant risk factor in sexual assault matters and that incidents of alcohol-involved sexual assaults were increasing, Ms. Burhans trained to become an alcohol prevention educator, then met with Highsmith to discuss the development of alcohol prevention education for students.  Highsmith disallowed Ms. Burhans to begin

5

alcohol prevention education for students.  Yale's July 2012 Compliance

Agreement with OCR noted inadequacies in Yale's programming.  Yale agreed to

reform its policies and practices.

20.  In 2003 and 2004, Ms. Burhans met and communicated thereafter

with Nathan Copper of the Sexual Assault Crisis Services at the Women and

Families Center, an off-campus non-Yale affiliated service provider for sexual

assault victims.  Copper wanted to collaborate and offer services to victimized

students.  Highsmith disallowed collaboration.  Yale's July 2012 Compliance

Agreement with OCR notes this failure as a problem for Yale.  Yale agreed to

reform its policies and practices.

21.  In 2003 and 2004, Ms. Burhans worked with community service

providers and external law enforcement officials in an effort to collaborate

regarding available resources.  Ms. Burhans asked Highsmith to adjust her job

description to include "community relations".  Highsmith disallowed the

collaboration and denied Ms. Burhans' request for expanded job description.

22.  Each year during Ms. Burhans' employment, Highsmith required

Burhans to contribute to the Clery Report with updated public safety education

information.  In 2003, Highsmith asked Ms. Burhans to specifically work on Yale's

Clery Act Report.  Ms. Burhans read police reports and met with various campus

officials to assess the correct number of reportable incidents.  During a meeting

6

at the office of Yale's General Counsel to discuss the final numbers, Ms. Burhans informed Highsmith that the sexual assault numbers "were wrong" and that the number significantly undercounted the truth.  Highsmith responded that Yale "need only report those incidents that are reported to police."  Thereafter, Ms. Burhans was forbidden by Highsmith to work on Clery Act Reports ever again and Ms. Burhans was forbidden to participate in orientation programs for freshman counselors.  Ms. Burhans was also forbidden to receive training on Clery Act compliance training and other forms of crime prevention training to support Title IX.  Yale was investigated by the Department of Education for Clery Act violations beginning in 2004 and was cited for underreporting incidents of sexual assault and rape in 2011.  Yale's July 2012 Compliance Agreement with OCR noted problems with Yale's Clery Act compliance.  Yale agreed to reform its policies and practices.

    23.  In 2003-04, Ms. Burhans proposed modification to Yale's sexual assault programming to make reporting to law enforcement officials easier. Highsmith rejected Ms. Burhans's proposal.  Thereafter, Highsmith edited Ms. Burhans's job description and removed all mention of Title IX and The Clery Act. Yale's July 2012 Compliance Agreement with OCR noted concerns regarding Yale's policies concerning the reporting of sexual assault matters to law enforcement.  Yale agreed to reform its policies and practices.

24.  In June 2004, Ms. Burhans attended an "Inter-Ivy Sexual Assault Meeting" at Yale.  Ms. Burhans reported to Highsmith that initiatives were discussed regarding prevention of alcohol-involved sexual assault and suggested new programming.  Highsmith denied Ms. Burhans the opportunity to develop prevention programs regarding alcohol-involved sexual assault.  Yale's July 2012 Compliance Agreement with OCR noted problems with alcohol-involved sexual assault at Yale.  Yale agreed to reform its policies and practices.

25.  In November 2004, during a meeting of the Committee for the Well-Being of Medical Students at Yale, students reported concerns about having no support when they report sexual assault matters to police.  Students noted that internal grievance procedures were inadequate and caused more harm.  Ms. Burhans offered support but Highsmith retaliated by disallowing Ms. Burhans to offer students her assistance in seeking a law enforcement response.  Yale's 2012 Compliance Agreement with OCR notes problems regarding Yale's policies concerned with reporting sexual assault matters to law enforcement.  Yale agreed to reform its policies and practices.

26.  In January 2005, Ms. Burhans attended an Inter-Ivy meeting at Brown University where she obtained ideas for sexual assault prevention including peer-training and training for Executive Committee members.  Ms. Burhans proposed her ideas to Highsmith who responded by rejecting the proposals.  Yale's 2012

8

Compliance Agreement with OCR noted these issues as problems for Yale.  Yale agreed to reform its policies and practices.

27.  In March 2005, Ms. Burhans was asked by law enforcement officials to train as a court advocate to help students involved in external judicial proceedings.  Highsmith forbade Ms. Burhans to become trained as a court advocate.  Yale's 2012 Compliance Agreement with OCR noted the inadequacies of legal advocacy at Yale.  Yale agreed to reform its policies and practices.

28.  In September 2005, Ms. Burhans proposed the creation of a web-based consolidated information resource for sexual assault victims.  Highsmith rejected Ms. Burhans's proposal and disallowed the creation of web-based consolidation of information and resources.  Yale's 2012 Compliance Agreement with OCR noted the lack of consolidated services.  Yale agreed to reform its policies and practices.

29.  In 2006, Ms. Burhans reported to Highsmith that many students were complaining about being revictimized during sexual assault grievance procedures.  Ms. Burhans was asked to create an outline of procedures for submission to Dean Cutler.  Ms. Burhans prepared an outline and followed up with questions about improving the process, and she made inquiries about progress regarding the procedures throughout 2006.  Her concerns regarding grievance procedures were ignored.  Yale's 2012 Compliance Agreement with

OCR notes the inadequacy of Yale's grievance procedures.  Yale agreed to reform its policies and practices.

30.  After years of frustration and failed attempts to perform her responsibilities, Ms. Burhans determined that Yale would not allow her to do her job and that Yale is inhibiting her efforts to bring Yale into compliance with Title IX and related laws.

31.  In the fall of 2006, Ms. Burhans began looking for alternative job opportunities at Yale.

32.  In early 2007, Ms. Burhans applied for the position of Director of Security Officers Operations.  She was interviewed for the position by an all-male panel, headed by George Aylward, Director of Security Programs.  Aylward told Ms. Burhans that they had another "strong candidate" but that unlike Ms. Burhans, the candidate had no university experience.  As of 2007, Burhans had worked successfully in Yale's Public Safety for eight years and had written a detailed plan for the department and had extensive university and student relations experience.  The job was not offered to Ms. Burhans.  The position was awarded to a white male who had not written a department plan and had no university or student relations experience.  Aylward asked Burhans to share the plan she had developed with the man who was hired for the position.  Burhans complied with this request.

33.  Ms. Burhans was formally offered the position of Assistant Director of Security Officers Operations at a salary of $80,000 per year.  She was told that her job responsibilities would include supervising her replacement in Crime Prevention and taking over emergency planning.  Burhans accepted the position, which included representing Aylward at meetings.

34.  Between May and June 2007, Ms. Burhans was performing the functions of Assistant Director, but had not yet been formally hired into the position.  She was eventually shown to her new office, which was 1/3 the size of the office of a man with an inferior position who was reporting to her; a man who recently had been demoted.  Ms. Burhans's new office was half the size of her prior office.

35.  Within days of being shown her new smaller office, Ms. Burhans was told she might not have the job after all.  On June 12, 2007, just six days before federal investigators were scheduled to arrive to investigate Yale for Clery Act violations, Burhans was told the job she had been offered had "disappeared." She was told she would keep her current responsibilities and facilitate emergency planning but with no reports.

36.  A white male was then hired for a nighttime supervisory job for which he was paid more money for lesser responsibilities than Burhans.

37.  Burhans inquired about yet another management job in Security and

11

was told: "It's all nights, you won't want it."  The job was given to a less qualified white male who did not work "all nights" and who received higher pay than Ms. Burhans.

38.   Burhans agreed, as part of her new position, to perform a long list of emergency planning initiatives, and she hosted meetings with department heads to initiate various relevant programming ideas.  Highsmith prepared a job description for Ms. Burhans which description included only a single reference to "emergency planning support."  The new description expressly reduced Burhans's management responsibilities and salary.  Originally offered $80,000, Burhans's salary was reduced to $72,000 and she was informed the numer could go even lower.

39.   Ms. Burhans was introduced at a Vice President's Division meeting on September 21, 2007, in front of 200 colleagues, as the person responsible for heading up emergency planning, although her job description included no such authority.  She was performing emergency planning duties and had been performing them since the beginning of 2007, but without management authority or fair remuneration.

40.   At the end of 2007, Ms. Burhans's job description was posted as an available position at a salary of $30,000 more than the salary Ms. Burhans was making.  Ms. Burhans formally applied for the title because she already was

performing the tasks.  Kumba Hinds of the Yale Human Resources Office approved Burhans's qualifications, but Highsmith refused to interview Ms. Burhans for the position.

41.  In December 2007, Ms. Burhans's job level was reduced from 25 to 23, ensuring she would not qualify for a management or leadership position.

42.  In January 2008, Ms. Burhans was told she could no longer work in emergency planning, which was part of her original job description and was part of the responsibilities she had been performing for many years.  When Ms. Burhans expressed her distress at losing responsibilities, she was called in for a meeting with Highsmith where she explained her concerns about loging responsibilities, opportunities, status and money.  Highsmith was hostile and criticized Ms. Burhans for refusing to accept her failures and lack of qualifications for certain jobs and promotions at Yale.

43.  In February 2008, Human Resources admitted to Ms. Burhans that there were gender equity problems existed in the Yale Security Department.  Ms. Burhans subsequently requested consideration for other jobs in the Security Department at Yale but was denied interviews by the department, overseen by Highsmith.

44.  On March 31, 2008, Burhans sought advice from Yale Medical School ombudsperson Merle Waxman, as the university side of Yale does not have an

ombudsperson.  Waxman referred Burhans to the Yale Equal Employment

Opportunity Office.  Director Valarie Stanley agreed to meet Burhans on April 1,

2008.  Stanley showed Burhans the large pile of unresolved complaints and

advised her to seek other internal job opportunities.  Stanley said she would

support Burhans in finding a new position.

45.  Thereafter, another emergency planning job was posted at a salary of

$129,000, which added the exact qualifications Burhans did not possess.  Ms.

Burhans was not interviewed.

46.  Ms. Burhans sought other employment opportunities and was

repeatedly denied consideration over a course of time up to and including

September 2012.

47.  In May 2008, Ms. Burhans reported to Vice President Linda Lorimer

her concerns about suffering discrimination and a hostile environment in her

attempts to secure appropriate employment at Yale.  Lorimer took no action even

after a followup call from Ms. Burhans to determine whether steps would be

taken to address her concerns.

48.  In September 2008, Ms. Burhans told Janet Adami in Human

Resources about her complaints regarding discrimination and hostile

environment.  Adami took no action.

49.  In October 2008, Ms. Burhans informed Lorimer of her interest in a

14

position with Customer Insights.  Ms. Burhans was the lead candidate and she

informed Lorimer of her interest in the job.  Thereafter, the job was withdrawn

and reposted with only one change in the description requiring applicants to have

experience that Ms. Burhans did not have.

50.  After being rejected for 32 internal jobs at that point and having

endured ongoing hostility, Ms. Burhans filed a complaint with the Connecticut

Commission on Human Rights and Opportunities.

51.  Days after Yale received Ms. Burhans's CHRO complaint, Ms.

Burhans's superior, George Aylward, canceled all regularly scheduled Monday

morning executive meetings.  This deprived Burhans of access to information

she needed to perform her duties.

52.  In November 2008, Janet Adams rejected Ms. Burhans's

qualifications for several new internal job opportunities, although Burhans already

had been approved by Human Resources.  Adami even refused to permit Ms.

Burhans to forward a colelague's recommendation to support her candidacvy.

53.  In January 2009, Aylward denied knowledge of Ms. Burhans's work

on two major projects despite his having discussed both projects many times at

multiple prior meetings with Ms. Burhans.

54.  In January 2009, six days after signing off on Yale's response to Ms.

Burhans's CHRO complaint, Highsmith made false and derogatory remarks

about Ms. Burhans in front of a colleague.  While angrily making those remarks, Highsmigh aggressively stepped from behind her desk and shoved her chair firmly against Burhans's chair, knocking her chair to the side with such force that one side of the chair lifted off the carpet causing Burhans to stumble and catch herself from falling.

55.  Repeatedly from 2008 to 2009, Yale officials, including Highsmith, withheld information from Ms. Burhans that she needed to perform her work effectively.

56.  Beginning in 2008 and continuing to the present in 2012, Ms. Burhans has experienced an increasing number of colleagues avoiding her.

57.  In February 2009, Ms. Burhans was denied the opportunity to prsent an innovative transportation program that she had designed to enhance student safety with improved efficiencies.

58.  In March 2009, Aylward screamed at Ms. Burhans for not having information to which Burhans had been denied access by Highsmith and Aylward.  Aylward threatened to embarrass Ms. Burhans for this in an email to colleagues.

59.  In March 2009, Ms. Burhans begged for help from the Yale HR and EEO offices to no avail.  She informed both that she was being prevented from doing her job.  Lorimer responded with so much verbal hostility that she literally

16

spit on Ms. Burhans.

60.  After additional hostility, Ms. Burhans complained to the HR, EEO and other Yale officials.  Thereafter, on April 8, 2009, Highsmith sent an email informing Ms. Burhans that her department was being restructured and that lay-offs were likely.

61.  Days later, Ms. Burhans was instructed to begin reporting directly to Highsmith.  Ms. Burhans complained about this change in her job responsibilities to HR and EEO, to no avail.

62.  Aylward subsequently canceled all Security staff meetings, which further isolated Ms. Burhans from access to information relevant to her employment responsibilities.

63.  On June 21, 2009, Ms. Burhans filed a complaint in state court alleging discrimination based on sex.  Days later, Highsmith announced at a staff meeting that Ms. Burhans was a "senior staff" member.  This seeming promotion to "senior staff" status was done without Ms. Burhans's knowledge or request. Ms. Burhans was being paid at least $15,000 less than her peers and had no staff reports.  Her responsibilities did not change.

64.  In July 2009, HR offered Ms. Burhans a development program coordinator position at a salary $16,000 lower than her rate of pay at that time.

65.  As of August 2009, Ms. Burhans had applied for fifty internal

positions.  She was rejected for all but one.  The one she was offered, the development program coordinator position, required her to accept a $16,000 pay cut.

66.  In September 2009, Yale Student Annie Le was murdered and raped on campus.  Highsmith withheld information from Burhans regarding campus community support meetings, thereby affecting Burhans's ability to perform her job.

67.  In October 2009, another job opportunity was presented to Mr. Burhans, although Janet Adami said Burhans was not qualified and refused to put her CV forward.  Once the hiring manager knew Burhans was interested, and reviewed her CV, she told Adami she wanted to interview Burhans.  Burhans was told that she was the leading candidate for the position.  Thereafter, for no apparent reason, the job was cancelled.

68.  During this same time period, a group of security program employees went to the EEO office at Yale and complained about discrimination in hiring practices by Aylward and others; some of the same individuals who had engaged in discriminatory practices against Ms. Burhans were named in this complaint.

69.  Highsmith reorganized security programs, after which Burhans was required to meet with Highsmith alone in her office on December 15, 2009.  During that meeting, Highsmith, who was in charge of campus public safety,

18

became so hostile that Burhans felt threatened and had to leave the office and notify HR.

70.  Thereafter, Ms. Burhans became even more isolated and targeted for additional retaliation.  She feared for her safety and sought support from EAP MSW Regina Belmont.  Belmont recommended that Ms. Burhans receive care from Wellness Corporation, Yale's EAP vendor.  Ms. Burhans sought treatment from Dr. Thomas, who described the environment at Yale as "toxic" for Ms. Burhans.

71.  Thereafter, Yale offered Ms. Burhans the choice of taking a medical leave, taking an administrative leave without pay, continuing to work in the same circumstances, or resignation.

72.  In January 2010, Ms. Burhans wrote a letter to several leaders at Yale including President Richard Levin, complaining to them about the discrimination, hostile environment and ongoing retaliation she was experiencing.  Levin did not respond, nothing changed and employment circumstances worsened for Ms. Burhans.

73.  In February 2010, Highsmith delayed approval of a project that had been completed in a timely manner by Ms. Burhans.  The delay set the project's timing back, which threatened harm to Ms. Burhans's reputation.

74.  In February 2010, at a Public Safety administrative meeting,

Highsmith announced imminent lay-offs and asked for a show of hands from employees with college-aged children.  Highsmith knew Ms. Burhans was the only employee with a child who needed and was taking advantage of the Yale scholarship program for employees.

75.  During February and March of 2010, Highsmith failed to approve or even respond to Ms. Burhans's work, causing delays and preventing approvals for important projects.

76.  During February and March, 2010, Highsmith scheduled and canceled meetings with Ms. Burhans, which caused confusion, particularly when meetings were being scheduled by email during non-business hours over the weekend.  In one email, Highsmith told Ms. Burhans she was sorry that Burhans found the work "so challenging".  Ms. Burhans replied that the work was not challenging, and that Highsmith's disruptive interference with her work was the problem.  Highsmith subsequently threatened to terminate Ms. Burhans for "extreme insubordination" for this comment.

77.  On March 8, 2010, Ms. Burhans became so emotionally distraught that she was constrained to take a few days of medical leave.  Ms. Burhans had been experiencing headaches, nausea, sleeplessness and emotional distress.

78.  On March 8, 2010, after work hours, on the same day Burhans was to begin a few days off due to stress, Highsmith sent Burhans a derogatory email,

20

threatening to terminate Ms. Burhans for poor job performance.  Highsmith knew

that Ms. Burhans had been performing her duties effectively for many years, yet

the email was described by Highsmith as a "formal warning."

79.  Thereafter, Ms. Burhans complained to HR, EEO and other Yale

officials, but to no avail.

80.  Dr. Thomas then wrote a second letter expressing concern that Ms.

Burhans was experiencing severe distress due to the hostility, ongoing retaliation

and "toxic" environment.

81.  On March 23, 2010, Ms. Burhans arrived for a scheduled meeting

with Highsmith.  Highsmith stated that Ms. Burhans was "laid off" and that

Burhans was forbidden to tell anyone.  Highsmith then walked out.

82.  The next day, Ms. Burhans was told to leave campus "ASAP"

because Highsmith wanted her off campus immediately.

83.  As of 2010, Ms. Burhans had worked at Yale for more than ten years,

and had received excellent reviews.  She was offered no transitional assistance

and her Yale email and Net ID were immediately cancelled denying Burhans

access to ten years of colleague contacts, helpful work records, and documents

reflecting career accomplishments.

84.  Ms. Burhans emptied out her office in three days.  On April 1, 2010,

Ms. Burhans left the Yale campus as instructed while Blance Temple from HR

supervised her exit off campus.

85.  Ms. Burhans's colleagues had no idea why she was terminated. Highsmith sent an email announcing Ms. Burhans's termination with no explanation and no forwarding contact information.

86.  Ms. Burhans requested a letter of reference so that she could seek employment elsewhere, but the letter she received was unusable because it did not fairly reflect her work history.

87.  Ms. Burhans lost her medical insurance while ill and had to badger Yale to get it reinstated and lost the capacity to make contributions to retirement accounts due to the lay-off.

88.  In July 2010, Yale's General Counsel allowed a Yale graduate program, that had been renting space from Ms. Burhans for five years, to break the lease and stop paying rent.  Yale offered no remedy for extgensive damage to Ms. Burhans's property caused by the program members.

89.  Ms. Burhans subsequently applied for many jobs at Yale without success.

90.  In December 2010, Ms. Burhans was hired for an internal job at Yale as a project manager.  The job was for contract employment only, for a one-year period, and required Burhans to work outside of her expertise and away from her previously established peer network.  She was designated "part-time" and the

only non-permanent employee in the department, and she was not afforded the same support, access to information, or job security as every other employee.

91.  In April 2011, 16 Yale students filed a complaint with the Department of Education's Office for Civil Rights, alleging multiple violations of students' federal rights under Title IX.  The complaint alleged that Yale had failed to adopt effective and equitable policies and procedures.  Many of the same problems identified in the students' complaints had previously been identified and brought to the attention of Yale officials by Ms. Burhans.  Ms. Burhans's concerns were ignored by Yale and Ms. Burhans suffered retaliation for her complaints and for her efforts to bring Yale into compliance with Title IX.

92.  On May 23, 2011, the U. S. Department of Education, after its longest investigation ever, cited Yale for "Failure to Properly File and Disclose Crime Statistics," specifically referring to sexual assault statistics which was exactly the problem Burhans had tried to correct.

93.  Ms. Burhans was notified in the summer of 2012 that her current job at Yale would end in November 2012.

**RETALIATION IN VIOLATION OF 42 U.S.C. §§ 2000e-1, *et seq.***

94.  The defendant retaliated against the plaintiff in violation of 42 U.S.C.

§§ 2000e-1, *et seq.*, for her good faith reporting and complaining about Yale's noncompliance with Title IX.

95.   Repeatedly and during a course of conduct from 2001 to 2012, the plaintiff endured retaliation by the defendant in response to her complaints about the hostile environment to which she was being subjected.

96.   The defendant's retaliatory acts caused the plaintiff to suffer adverse consequences in her employment.

97.   The plaintiff ultimately was terminated from employment at defendant in retaliation for her good faith reporting and complaining about the hostile environment to which she was being subjected, and for the defendant's noncompliance with Title IX.

98.   As a direct and proximate result of the defendant's actions, the plaintiff suffered and continues to suffer lost earnings and benefits, emotional pain, adverse medical diagnoses, suffering, professional and personal embarrassment, humiliation, loss of enjoyment of life, and inconvenience.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Susan Burhans prays for relief as follows:

1.   Judgment awarding Plaintiff back pay, front pay, damages for adverse medical diagnoses, emotional distress, compensatory damages, and punitive damages, in an amount to be determined at trial but no less than ten million

dollars ($10,000,000.00);

    2.  Attorney fees and costs;

    3.  Prejudgment interest at the statutory rate;

    4.  Such other and further relief as the Court may deem appropriate.

    ***The plaintiff claims trial by jury.***

COUNT TWO

    1.  This is an action pursuant to the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60, *et seq.*  This court has supplementary jurisdiction of this action pursuant to 28 U.S.C. § 1367(a).

    2.  The plaintiff has complied with all of the procedural prerequisites to suit under the statutes aforementioned.

    3.  The defendant is an educational corporation in the City of New Haven.

    4.  The plaintiff is a woman who has been employed by the defendant continuously since August 1999 as a Communications Specialist in the Office of the Vice President and Secretary of Yale University.  She is the Manager of Security Education.  She develops programs and delivers presentations campus wide for service initiatives.  Working closely with the Yale College Dean's Office, Graduate and Professional Schools, University Police and Security Programs, she initiates and facilitates programming and service improvements for the Yale

community.  She facilitates university response for employee and student customer service issues by consulting, trouble-shooting and implementing changes.  She engages student, faculty and staff participation in innovative approaches and solutions for prevention programming.  She redesigned freshmen orientation, implementing peer performers with multi-media values for education and marketing and she facilitates problem solving of quality-of-life issues for Yale and the City of New Haven.  She always received excellent evaluations and praise from her peers, colleagues and supervisors.

5.  On April 23, 2008, the Office of the Secretary and Vice President posted a new position for Director of Emergency Planning, at an annual pay rate of $122,000.  This new posting was part of the defendant's effort to keep the plaintiff from being promoted.  The plaintiff had applied for that position under its earlier posting a few months earlier.  The plaintiff had been obviously the best qualified person for the position.  When that became apparent, the job posting was taken down.  On April 23, this new posting was put up rewritten in such a way as to make it less likely that the plaintiff could qualify for the job.  This was the latest in a series of actions clearly intended to keep the plaintiff from advancing within her area of specialization at Yale University.

6.  Thereafter, realizing that the defendant would never advance her within her field, the plaintiff began to apply for other positions in the University for which

she was well qualified and which hopefully would allow her to get out from under the glass ceiling she had hit.

7.  On May 1, 2008, the plaintiff applied for a newly-created position of Assistant Dean for Freshmen Affairs in the office of the Dean of Yale College. The plaintiff was well qualified for that position but the position was given to a male.

8.  On June 5, 2008, having previously spoken with her about the matter on May 7, the plaintiff wrote to Linda Koch Lorimer, who is the Vice President and Secretary of the defendant.  She knows the plaintiff well, has worked with her on many occasions, and knows that she is qualified for a better position and better pay than she currently receives.  She also knows through exit interviews and otherwise that significant issues of gender discrimination and a working environment hostile to women exist in the defendant's Security Programs.  Those issues were discussed at Lorimer's executive retreat that very year.  The plaintiff specifically explained the problems she had been encountering over the previous year and asked for her help.  Despite that, and despite the plaintiff thereafter having applied for several other better jobs within the University for which she was qualified, the plaintiff was not even given an interview.

9.  Thereafter, better positions which the plaintiff deserved, at better rates of pay which the plaintiff also deserves, were given to males who were not any

27

better qualified than the plaintiff.  Among those were the promotion of Frank Biceglia to a Grade 25 position overseeing transportation dispatch, cultural properties and the central alarm station on October 21, 2008.

10.  On May 31, 2008, a new version of the position of Public Affairs Officer II was posted at a Grade 24 pay level.  The plaintiff applied and her resume was forwarded to the hiring manager.  The plaintiff had applied for that job late in 2007, when it was posted at a Grade 28 pay level with a starting salary of $107,000, and was told that she was qualified for the position.  This time, however, when the same job was posted at a lower pay level, the plaintiff was told on August 26, 2008, that she was not qualified for it and would not even be given an interview.

11.  The sex discrimination to which the plaintiff has been subjected by the defendant began early in 2007.  In February 2007 the plaintiff was up for a job within Security Programs at the University.  The other frontrunner for the job was a male who was an old friend of the male hiring official.  Although the plaintiff had worked in policing and security at the university for eight years, with an excellent reputation and performance evaluations, the job was given to the male friend.  All the members of the hiring panel were males.

12.  When the plaintiff was told that the job was going to a male, she also was told that her qualifications were so outstanding that she would be given the

28

number two position as his assistant.  The plaintiff was told that her salary would be $80,000 per year, a substantial increase over what she was earning.  A job description for the position was finalized.

13.   Six weeks later, the man in charge of the process told the plaintiff that her promised job had "disappeared" but that she would stay in her current position but be given an increased role in the department and the responsibility of leading the university's emergency planning  under the supervision of the department director.  The plaintiff was told that her salary would be "in spitting distance" of the $80,000 she had been promised.

14.   Later, the plaintiff learned that the "number two" position she had been promised had not "disappeared" at all but instead had been given to a male with lesser qualifications than hers.

15.   In August 2007 the plaintiff was "transitioned" into her supposed new job and had a detailed discussion with the Deputy Secretary of the University and the Director of Security Programs, who was the hiring official for the other positions that the plaintiff did not get.   At that time the plaintiff was promised that her salary would be "worked out" and on August 29, 2007, was told she would receive, and agreed to accept, an annual salary of $72,000.

16.   In mid-September 2007 the plaintiff was told that her promised $72,000 salary was "under discussion."  This was shocking to the plaintiff, since

the Office of the Vice President in November 2007 posted a job with duties very similar to those which the plaintiff was performing, at a salary in excess of $90,000 annually.

17.  In December 2007 the plaintiff was informed that she would not be given any pay increase at all but still would be expected to perform her increased responsibilities.

18.  The defendant's Office of Security Programs and Human Resources has consistently discriminated against women, including the plaintiff, in hiring, in pay, and in promotions.  Women, including the plaintiff, have been discouraged from seeking employment or advancement within that office.

19.  In the manner described above, the defendant has been consistently discriminating against the plaintiff in jobs and benefits because of her sex, in violation of the Connecticut Fair Employment Practices Act.

WHEREFORE, the plaintiff claims judgment against the defendant.

THE PLAINTIFF

BY:_____/s/_____
       JOHN R. WILLIAMS (ct00215)
       51 Elm Street
       New Haven, CT 06510
       203.562.9931
       Fax:  203.776.9494
       jrw@johnrwilliams.com
       Her Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
JOHN R. WILLIAMS