UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

SUSAN BURHANS                         :

VS.                                   :        NO. 3:12cv1462(WWE)(JGM)

YALE UNIVERSITY                       :        MARCH 11, 2015

**<u>MOTION FOR RECONSIDERATION</u>**

The plaintiff respectfully moves that this court reconsider its

Recommended Ruling on Defendant's Motion for Protective Order, filed February

26, 2015.

Ms. Burhans filed what can fairly be called a Jackson v

Birmingham, Title IX Retaliation Complaint.  Jackson was decided for

the plaintiff in 2004 by the Supreme Court involving Roderick Jackson,

a teacher and girls' basketball coach in Alabama who complained about

gender inequities in resource allotment and funding for his team

compared with the boys' team.  Once Mr. Jackson complained and

wanted the inequity addressed he began to suffer from retaliation by

the school administration.

1

Title IX enforcement was not in his job description, however, federal civil rights laws were being violated and he notified school leadership just as Ms. Burhans did.  According to the Department of Education Office of Civil Rights, "[C]ivil rights laws enforced by OCR extend to all state education agencies, elementary and secondary school systems, colleges and universities, vocational schools, proprietary schools, state vocational rehabilitation agencies, libraries, and museums that receive U.S. Department of Education funds."[1]

As Ms. Burhans performed her job in the vice president's office she identified inequities as to public safety resources for victims of sexual misconduct.  These students were not female basketball players being denied resources for their athletics as in the case of Roderick Jackson.  Ms. Burhans witnessed sexual misconduct survivors being denied their Title IX civil rights support services at Yale University.

Ms. Burhans notified her boss Martha Highsmith about violating federal laws and nothing was done to address the problem. Please see Ms. Burhans' reporting structure and interface with leadership. (P 1- 2) Ms. Highsmith attempted to silence Ms. Burhans by committing

---

[1] http://www2.ed.gov/about/offices/list/ocr/aboutocr.html

egregious adverse employment actions against her detailed in the previously submitted Title IX Retaliation Timeline.

As the National Education Association notes in its Jackson v Birmingham Amicus Curiae:

> "Educators play an essential role in the enforcement of Title IX, which would be stifled if educators could be subjected to retaliation without redress when they seek to correct violations of the statue."[2]

Students do not have equal access to education according to Title IX if their campus is unsafe and hostile and educational opportunities are not accessed due to this.  Ms. Burhans made great efforts to facilitate a safe campus environment according to Title IX and the Clery Act.

The defendant has styled its argument insisting the Title IX discrimination and retaliation experienced by the plaintiff occurred in a vacuum. Plaintiff's evidence discloses a leadership system that does not address discrimination and retaliation and has not complied with Title IX and the Clery Act and has participated in non-compliance cover up allowing the hostile environment resulting in plaintiff's retaliation and adverse employment actions. A history of the plaintiff's chronology

---

[2] *Amicus Curiae* of the National Education Association to US Court of Appeals, 11th Cir

of notifications to leadership and adverse employment actions perpetrated against her are available in *Burhans Title IX Retaliation Timeline* previously filed.

Supporting Ms. Burhans' complaints of systemic gender equity issues are also two major federal investigations. Within one year of the plaintiff's termination, the Department of Education's Office of Civil Rights began investigating Yale regarding Title IX response practices for sexual misconduct.  Prior to this and concurrently the Department of Education Clery Team investigated Yale University from 2004 – 2011 for underreporting sexual assaults including the very year Burhans complained of underreporting.

Defendant tried to conceal the termination designating it a lay-off. However, actions against the plaintiff are redolent of termination for cause: unlike every other laid off employee plaintiff was laid off alone and not allowed to stay in her office for three months to afford peer access for job networking; Ms. Burhans was told she could not let anyone know she lost her job; harassed by HR rep Blanche Temple by multiple phone calls and in person following leadership's retaliating commands to force Ms. Burhans out of her office and job of 10.5

4

years, in three business days. At one point telling Ms. Burhans, "They've told me I have to make sure you are off campus as soon as possible." Ms. Burhans had done nothing wrong and was a highly performing employee.

In addition, without the plaintiff's knowledge an email was circulated to hundreds of Ms. Burhans' colleagues that she was no longer at the university appearing she had been fired for cause. Her net ID was discontinued. Four separate Yale IT staff at different times told Ms. Burhans that this was NEVER the practice for laid off employees. One staff member told Ms. Burhans, "Even when people leave Yale and come back 5 years later – they keep their Net ID."

The federal documents defendant refers to on page 5 of its response are not static.  Ms. Burhans worked for the vice president's office for 10.5 years and the investigations correspond to that period when long-time practices violated Title IX and the Clery Act. The Clery investigation began in 2004.  The Office of Civil rights Title IX complaint filed by undergraduate students spanned almost a decade of non-compliance.

Ms. Burhans worked within the vice president's office at Yale

University and interfaced with university leadership. Ms. Burhans' job

description originally included and also finalized in 2003 during a job

audit continued to include:

> "Reporting to the Deputy Secretary in the Office of the Vice President,
> develop and support all of the university's crime prevention programs. In
> support of *Department of Education guidelines*, evaluate community security
> awareness needs, develop and execute a strategic communications program
> that includes marketing Yale's services and implementing initiatives to serve
> the community." (p 3)

Ms. Burhans performed *public safety education and program*

*services* for students. Ms. Burhans produced orientations for vulnerable

populations, participated in student meetings and committees, referred

students for counseling, employed students as peer educators and

served as the key feedback person on campus safety to Yale

leadership for over 10 years.  The Department of Education recognizes

guaranteeing equal access to education requires a comprehensive

approach and is careful to delineate covered areas.

> "[S]ex discrimination is prohibited by **Title IX** of the Education Amendments
> of 1972; These civil rights laws enforced by OCR extend to all, (…) colleges and
> universities, (…) that receive U.S. Department of Education funds. Areas covered
> may include, but are not limited to: admissions, recruitment, financial aid, academic

6

programs, <u>student treatment and services, counseling and guidance</u>, discipline, classroom assignment, grading, vocational education, recreation, physical education, athletics, housing, and <u>employment.</u>"[3]

The court's recommended ruling states that Ms. Burhans had no responsibility for these matters at Yale. In the course of her employment Ms. Burhans performed responsibilities within the Title IX covered areas referenced above, "student treatment and services and counseling and guidance."  Ms. Burhans identified a void of Title IX support services for sexual misconduct victims resulting in discrimination based on sex.

Providing victims the full panoply of choices including to report to police is part of Title IX law 20 U.S.C. § 1681(a), and the university is reminded it is a requirement following the federal investigation of Yale in the Department of Education Office of Civil Rights – Yale Resolution Agreement Sections A. 3. a-b, d and B. 3 and in the Clery Act [B] *(v-vii)*.

Defendant's claim that Burhans had no Clery Act responsibilities is false.  Further in her job description, Ms. Burhans' duties include, "Responsible for developing programs that ensures university complies

---

[3] http://www2.ed.gov/about/offices/list/ocr/aboutocr.html

with the Clery Act."

Additionally, a Yale Human Resources seminar helped the plaintiff prepare an "elevator speech" describing her job. The only Department of Education guidelines applicable to plaintiff's job concern Title IX and the Clery Act.

Plaintiff was ordered and funded to attend Clery Act training by the vice president's office until 2003 when she notified the general counsel's office and the vice president's office that Yale was underreporting sexual assaults according to the law.

The vice president's office removed all mention of Title IX and Clery Act *after Ms. Burhans notified Ms. Highsmith and Ms. Hendel they were underreporting sexual assaults according to the law.* Ms. Burhans was demoted from working on the Clery Stats ever again and after a separate Department of Education investigation Yale was fined for underreporting sexual assaults the *very year* Ms. Burhans tried to correct Yale's practices.

Furthermore, Ms. Burhans helped Yale comply with the Clery Act by providing public safety education programming and the vice

8

president's office requested her textual input as detailed in The Jeanne
Ann Clery Act in sections D. and E.

In its recommended ruling, the court refers to Yale Vice
President Lorimer's deposition.  The sixteen separate claims of sexual
assault involve Ms. Burhans in the following way.  Burhans reported to
the vice president's office that reported directly to President Richard
Levin, who is responsible for complying with federal laws including Title
IX, and Lorimer, an attorney, had direct oversight of campus public
safety services from 1993 – 2010 and was obliged to make certain
public safety services, a Title IX covered area, was complying with Title
IX. Burhans, working for the vice president's office providing a Title IX
covered service interfacing with students, performed orientations,
referred students for counseling and served as the key feedback
person for public safety to the vice president's office had an obligation
as well to uphold Title IX law.  While providing services within this Title
IX covered area Burhans became aware of students (including these
16 referred to) suffering Title IX discrimination in public safety and
reported this to the vice president's office. The issue was not
addressed. Burhans observed firsthand the students being affected,

including those mentioned throughout Burhans' materials.

The court refers to former detective Peter Brano and the ten sexual assault investigations which did involve Ms. Burhans' work.  Ms. Burhans attended weekly command-level police staff meetings. Detective Brano attended as well.  Burhans' prevention programs and initiatives were geared to build an environment that supported students reporting sexual misconduct to police in accordance with Title IX and Clery Act laws.  Burhans and Brano worked in concert, when appropriate, to help students.  In fact, at Yale Police request Burhans helped an international female grad science student come forward to report her rape to Yale Police. All previous efforts were unsuccessful.  Brano became the lead investigator.  This student's rapist was indicted, convicted and remains in jail to this day due in part to Burhans' efforts. Exhibit page (  ) are two brief emails Mr. Brano sent Ms. Burhans that demonstrate her history of helping this rape survivor.

The court refers to former Deputy Secretary Martha Highsmith who reported directly to VP Lorimer.  It is clear that all universities must comply with Title IX law including the covered area student treatment and services, counseling and guidance (shown above). Public safety is a student service.  Because the president's office and the vice president's office were not complying with Title IX law student

10

victims of sexual misconduct were not receiving federally mandated services.  Department of Justice, Department of Education Office of Civil Rights and Clery Act statutes cited above state every sexual misconduct victim must be offered the full panoply of services and options to address the incident.  Ms. Burhans worked out of the vice president's office that had clear supervisory responsibilities over public safety.  Yale leadership, including Ms. Highsmith, who has a PhD in education and is aware of Title IX law and Ms. Burhans, had the obligation to make certain the laws were complied with and that students were supported in reporting to police.  Ms. Burhans observed Yale's illegal practices that affected the 16 parties and many more. This is why Ms. Burhans includes these parties in her supporting documents for her claims.

The court refers to facts surrounding the campus rape of Constance Gerena's daughter.  This student's repugnant experience relates directly to the fact that Ms. Burhans was stopped from continuing to help students report rape to police according to Title IX and the Clery Act.  Ms. Burhans arranged for this deposition because Ms. Gerena's daughter was the first rape victim reporting to police after Ms. Burhans was instrumental in helping the female science grad

11

rape victim come forward to police resulting in the rapist being indicted, convicted and jailed for his crime.  Due to Ms. Burhans' success in helping this rape survivor come forward Yale Police arranged for Ms. Burhans to train with long-time New Haven court advocate Barbara Bellucci  so she could continue to support students reporting to police and navigate the court system.  Ms. Burhans began the training with Ms. Bellucci. The vice president's office stopped the training.  Ms. Burhans was not allowed to help Ms. Gerena.  Ms. Gerena's deposition is attached.  Note that the dean did not offer police or ambulance services for Ms. Gerena  for the rape itself and then note throughout deposition the re-traumatizing retaliating events (Title IX non-compliance) her daughter suffered.  Note Constance Gerena's understanding of why her testimony is so important. Ms. Burhans had tried very hard to bring Yale University into Title IX compliance in public safety because of the discrimination she observed including students were not supported in reporting to police because Yale did not want crime stats.  Also note former detective Brano actually put Yale victims in touch with each other because of the hostile way Yale treated female sexual misconduct victims.  Constance Gerena, who is a Bronx, New York school teacher, directly asked Yale leadership about Title IX. Ms. Gerena's Title IX concerns were not addressed.

The court refers the deposition of Dr. Heidi Lockwood, who taught and

12

advised Yale students in the philosophy department at Yale and observed that student sexual misconduct victims were not provided Title IX support services. The point here is that Burhans and Lockwood did not know each other while at Yale worked in completely different departments and observed the exact same Title IX non-compliance that was denying students equal access to their education. Dr. Lockwood was retaliated against for helping students as well. Ms. Burhans knows this is relevant because it illustrates the systemic illegal non-compliance at Yale that provided the fertile ground for mistreatment, discrimination and retaliation.

A brief correction concerning plaintiff's claims regarding Ms. Boyd is in order.  Ms. Burhans does not claim to take credit for programs Ms. Boyd quickly put into place once the Department of Education's Office of Civil Rights began their investigation into Yale's non-compliant Title IX practices.  Ms. Burhans had tried from 1999 - 2010 to put these very programs in place and was not granted permission to do so.

Former Yale President Richard C. Levin had ultimate legal and fiduciary responsibility to the Yale Corporation and to students, faculty, and staff for the university's role in upholding federal laws and

providing a safe campus environment.  During Ms. Burhans career at Yale she received excellent performance evaluations and worked within the VP's office that reported directly to President Levin.

Ms. Burhans applied to approximately 100 jobs to escape the retaliation from the vice president's office.  In addition to the reports Ms. Burhans made to the appropriate Yale offices at this time the university did not have a properly trained and certified Chief Diversity Officer in human resources or in the provost's office. In fact, several properly trained staff left the university abruptly.

Before notifying President Levin directly by email on January 10, 2010, along with other senior leaders regarding the discrimination and retaliation she was suffering, the plaintiff made the following notifications to the appropriate offices that all report directly up through to the president's office.  These notifications do not include all emails and phone calls.

Ombuds Notifications - Ms. Burhans first reported discrimination and retaliation to a university ombuds in August 2007 and again in November and then March of 2008; several times in 2009 and January 10, 2010.

Vice President's Office Notifications - Ms. Burhans reported discrimination,

retaliation and hostile work environment to the vice president's office on January 30, 2008.  Additionally, Vice President Linda Lorimer had a leadership retreat on February 8, 2008 where discussion included the hostile environment in public safety.  Ms. Burhans notified Ms. Lorimer directly on May 7th, and followed up on May 19th.  Separately Ms. Lorimer was notified by employee Michael Dyson in spring 2008 that security programs was discriminating against minority workers. Since the VP's office was the main retaliatory office Ms. Burhans could not continue to report her concerns because retaliation escalated.

Human Resources Notifications - Ms. Burhans reported discrimination, retaliation and hostile work environment to human resources to: Chris Pedevillano Dec 18, 2007, January 23 and 30, 2008; Christine Perez February 26, 2008 (who admitted to Burhans there were known gender problems in public safety), Janet Adami September 25, and November 24, 2008, October 1, 2009; Sandra Greer January 16 (Burhans was assaulted by Ms. Highsmith) March 9, & 27 (Burhans was spit on by Ms. Lorimer) 2009, April 8 & 17, July 7, 2009, January 10, 2010; Corey Rossman April 14, 2009; Erica O'Connor recorded on plaintiff's voicemail attempting to get plaintiff to take a 16K pay-cut and attesting to HR's knowledge of the retaliation.

Office for Equal Opportunity Programs Notifications - Ms. Burhans reported discrimination, retaliation and hostile work environment to Valarie Stanley in the

15

Office of Equal Opportunity April 1, May 6, and October 2008; January 16,
(Burhans was assaulted by Ms. Highsmith)  March 9 & 27 (Burhans was spit on
by Ms. Lorimer), April 8 & 17, October 1, 2009 (Stanley admitted to Ms. Burhans
she ocul dnot do her job because of Yale's practices); separately in Fall 2009
EEO receives approximately 24 unfair hiring practices complaints against
security programs; December 15, 2009 (Burhans was forced to meet with Ms.
Highsmith alone in her office and had to flee for her safety; January 10, 2010.

When President Levin received Ms. Burhans' email on January
10, 2010, the discriminatory acts and retaliation actually escalated and
caused Ms. Burhans severe stress and many adverse employment
actions followed.  Ms. Burhans relied on Dr. Levin's leadership to
uphold federal laws.

In addition Ms. Burhans needs to question President Levin about
many direct notifications from interested groups on campus who
submitted detailed complaints about discrimination, retaliation and
federal law non-compliance.

Ms. Burhans should be allowed to question Yale's leader
concerning her direct notification to him and his direct reports and the

severe breakdown of critical staff failing to uphold federal laws resulting in Ms. Burhans' prolonged suffering.

Dr. Peter Salovey has served as Yale College Dean, Director of the Graduate School of Arts and Science, and Provost while Ms. Burhans worked at the university and suffered discrimination and retaliation since 2007 for trying to perform her job according to Title IX and the Clery Act.

Ms. Burhans contacted President Salovey directly on February 7, 2014 after being terminated twice for no cause and after applying for 115 internal jobs in efforts to continue her career and restore her financial, reputational well-being.  Ms. Burhans needs to explore why the discrimination and retaliation continues in President Salovey's administration even after the federal investigations and the fines.  Ms. Burhans never received a response to her email, has proof the email was read and must have the right to question Yale's president.

Just recently President Salovey distributed to the Yale community a message about harassment and retaliation.   The plaintiff has inquiries about this as well.

Ms. Burhans worked at Yale with excellent performance evaluations as a permanent employee for 10.5 years.  Six months after her first termination she accepted the only job available to her after applying to at least 85 jobs at the time. This job was within the Office of the Associate Dean and Clinical Affairs at Yale Medical School. Only after accepting the position did she learn it was contract only not permanent employment.

During her tenure there Dr. Alpern sent out a community message on April 12, 2011 stating "there is zero tolerance for any form of sexual harassment at the School of Medicine and Public Health. All complaints are taken seriously…"   Ms. Burhans was still being retaliated against systemically through her job at the medical school resulting in her being the only employee laid off once again.

Ms. Burhans relied upon leadership to uphold the law and stand by their statements supporting federal law.  During her tenure at the medical school Dr. Alpern allowed known harassers to continue their illegal activities without consequence resulting in a hostile environment forcing accomplished women scientists and staff (including Ms. Burhans) to be forced out of Yale Medical School.

18

In 2005 John Pepper was vice president of finance and administration at Yale and was working to improve diversity. President Levin confirms Shauna King succeeded Mr. Pepper. Shauna King reported directly to former President Richard Levin and reports now directly to President Peter Salovey.

Shauna King's leadership extends outside of Yale. Ms. King has contributed to the 2011 book by Anna Maria Valerio titled *Developing Women Leaders: A Guide for Men and Women in Organizations*. Chapters in the book include, addressing gender equity in "Driving Forces behind Organizational Change," and "What Can Managers Do to Develop Talented Women?"[4]

Ms. King brought a senior level associate vice president into Yale she had worked with at previous organizations, Ann Murray-Randolph. Ms. Burhans learned from colleagues that Ms. Murray-Randolph suffered discrimination and retaliation from male colleagues while performing and notified human resources and Yale leadership.  Ms. Murray-Randolph was being harassed by her supervisor and had to

---

[4] Anna Marie Valerio ISBN: 978-1-4051-8370-3 October 2009, Wiley-Blackwell

witness female executives presenting at high-level meetings while male executives sat in the back of the room and laughed and heckled.

As is the case with Ms. Burhans, Ms. Murray-Randolph's concerns were not addressed even though she was a close, talented associate of Shauna King, one of the top Yale women leaders. Leadership, including Shauna King, has responsibility to uphold Title VII and Title IX laws, and yet, once again, university leadership did nothing. Ms. Murray-Randolph was not able to perform her job and continue her career at Yale. Ms. Murray-Randolph had to hire an attorney to get her out of the hostile environment at Yale for a price.

Ms. Burhans needs to inquire of vice president Shauna King, one of the top leaders at Yale, about the university's response to discrimination and retaliation concerns.

Ms. Janet Lindner now has oversight of Title IX covered areas, police and security programs. Ms. Burhans was fired the first time in March 2010, right after Linda Lorimer and Martha Highsmith were stripped of their responsibilities to lead Yale University Police and Security Programs when the Department of Education's investigation cited Yale for violating several sections of the Clery Act. One of the

violations, underreporting sexual assaults, was cited in exact year that Ms. Burhans tried to correct Yale's unlawful practices.

Ms. Burhans has shown comprehensive evidence illustrating her efforts to uphold Title IX and Clery act laws in public safety.  Ms. Burhans needs to inquire about Ms. Lindner's indifference to continuing concerns regarding Yale Police and Title IX non-compliance including that a mistreatment complaint that was never addressed, and then this same Yale Police detective recently told a female sexual misconduct complainant that his job has "nothing to do with Title IX – that's a different department."

The plaintiff should be permitted to assemble a cohesive line of information that exposes the hostile culture at Yale that has allowed Title IX violations for decades and the retaliation she has suffered to try to stop Yale's illegal practices.  The plaintiff's retaliation is one of many stories that have forced intelligent, successful females to leave their academic programs and careers at Yale University.  The plaintiff wants to this end. Each deposition will last about an hour and will take place just blocks from their current offices.  There is no hardship of time, location or resources.  The Yale University endowment reveals a

healthy accounting.

THE PLAINTIFF

BY:_____/s/_____
          JOHN R. WILLIAMS (ct00215)
          51 Elm Street
          New Haven, CT 06510
          203.562.9931
          Fax:  203.776.9494
          jrw@johnrwilliams.com
          Her Attorney

CERTIFICATION OF SERVICE

On the date above stated, a copy of the foregoing was filed electronically and
served by mail on anyone unable to accept electronic filing.  Notice of this filing
will be sent by e-mail to all parties by operation of the Court's electronic filing
system or by mail to anyone unable to accept electronic filing as indicated on the
Notice of Electronic Filing.  Parties may access this filing through the Court's
CM/ECF System.

_____/s/_____
          JOHN R. WILLIAMS